UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

SAMUEL RONAN, *et al.*,

        Plaintiffs,

                        **:**

v.

FRANK LAROSE, *et al.*,

        Defendants.

                        **:**

Case No. 2:26-cv-343
Chief Judge Sarah D. Morrison
Magistrate Judge S. Courter M. Shimeall

## OPINION AND ORDER

Samuel Ronan says he wants to run as a Republican in the May 2026 primary election for Ohio's 15th Congressional District. Ana Cordera wants to vote for him. To that end, Mr. Ronan filed his declaration of candidacy, attesting to his membership in the Republican Party and affirming his intent to support and abide by that party's principles. The Franklin County Board of Elections ("BOE") certified his candidacy on February 17, 2026.

One problem – after Mr. Ronan declared his intent to run as a Republican, he publicly stated that his candidacy was part of his strategy to run Democrats as Republicans in primary elections in "deep red districts" to "get a foot in the door." This statement got the attention of Republican voter Mark Schare, who filed a protest of Mr. Ronan's candidacy with the BOE on the grounds that Mr. Ronan was not, in fact, a Republican. The BOE held a hearing on Mr. Schare's protest, and its members (Douglas J. Preisse, Meredith Freedhoff, Jamie L. Shumaker, and Michael

E. Sexton) voted on party lines, resulting in a tie. Secretary of State Frank LaRose broke the tie and disqualified Mr. Ronan from appearing on the ballot.

Mr. Ronan filed this case asserting three claims. First, he alleges that requiring a candidate to truthfully declare his partisan affiliation and then using his speech to disqualify him for a false declaration of affiliation violates his First Amendment rights.[1] Second, he alleges that a "good faith" affiliation requirement for a partisan primary exceeds the State's power under the Elections Clause. Third, he alleges that BOE Member Freedhoff should have recused herself from voting on the protest against his candidacy because of her connection to the Franklin County Republican Party ("FCRP") (which endorsed his primary opponent) and that her failure to recuse violated his due process rights.

On March 20, the Court held an informal preliminary conference on Mr. Ronan's motion for injunctive relief and granted a temporary restraining order. Now before the Court is whether the temporary restraining order should be extended to a preliminary injunction. The matter is fully briefed, and an evidentiary hearing was held on April 2. For the reasons below, the Motion for Preliminary Injunction (ECF No. 2) is **DENIED,** and the Temporary Restraining Order (ECF No. 10) is **VACATED**.

---

[1] Plaintiffs' counsel concedes that Ms. Cordero's First Amendment claim is derivative of Mr. Ronan's First Amendment claim.

## I.  BACKGROUND

Mr. Ronan first sought political office in 2016, when he ran unsuccessfully as a Democratic candidate for the Ohio House of Representatives. (Ronan Dep., ECF No. 27-1, PAGEID # 666.) The next year, he ran unsuccessfully for Chair of the Democratic National Committee ("DNC"). (*Id.*, PAGEID # 667.) During his campaign for DNC Chair, Mr. Ronan stated that, if he became Chair, he would run Democrats as Republicans in deep red states, because it would be the only way for Democrats to win. (March 6 Hr'g Tr., ECF No. 26-1, PAGEID # 288–89.)

In 2018, Mr. Ronan challenged incumbent Ohio Congressman Steve Chabot in the Republican primary. In that race, Mr. Ronan self-identified as a "progressive," and he explained his partisan change in an interview:

> I put my money where my mouth is. Last year I ran for the DNC Chair and I said if I were the Chair, we would still have to run Democrats as Republicans because that's the only way you're going to make it through. And here I am, I guess, putting the rubber to the road.

(ECF No. 26-1, PAGEID # 226.) Mr. Ronan did not advance past the primary.

Six years later, in 2024, Mr. Ronan considered running for president. (Verified Compl., ¶ 12, ECF No. 1.) He shared in an interview that he wanted to run as a Republican because his "values are actually better received in the Republican Party," adding that the Republican Party does "not prevent people from running" and does "not close their primaries." (*Id.*) He said he was a member of the "Republican Party of yesterday" embodying the "true value of where the Republican Party thrived back during the [President Dwight D.] Eisenhower years." (*Id.*)

### A.    Mr. Ronan's Candidacy for the May 2026 Republican Primary

In Ohio, a person can be qualified to be a candidate in a partisan primary, regardless of prior party affiliation, if the person (1) does not currently hold elective office,[2] (2) collects sufficient signatures of qualified electors of the same political party as the one the prospective candidate seeks to represent, and (3) submits a valid declaration of candidacy. Ohio Rev. Code §§ 3513.07, 3513.191(B). The declaration of candidacy requires the prospective candidate to declare, under penalty of election falsification, his voting residence, his political affiliation, and the office for which he seeks to appear as a candidate on the ballot. Ohio Rev. Code § 3513.07. The candidate must also declare that, if elected, he will "support and abide by the principles enunciated" by his selected political party. *Id.*

Mr. Ronan decided to run as a Republican in the May 2026 primary against incumbent Congressman Mike Carey in Ohio's 15th Congressional District. (Ronan Dep., PAGEID # 668.) Mr. Ronan signed his declaration sometime in December 2025 or January 2026 and began collecting signatures. (March 6 Hr'g Tr., PAGEID # 297–99.) He submitted his declaration and petitions to the BOE on or about January 27, 2026. (ECF No. 26-1, PAGEID # 334.) On his declaration, Mr. Ronan swore under the penalty of election falsification as follows:

---

[2] If the candidate currently holds partisan elective office and wants to run as a candidate for nomination or election for a different party, he can only change his affiliation for a party primary if he files a declaration of intent in compliance with Ohio Revised Code § 3513.05. *See* Ohio Rev. Code § 3513.191(C).

**Declaration of Candidacy**

NOTE - The candidate must fill in, sign and date this declaration of candidacy before the signatures of electors, are affixed.

I, _____ Samuel P. Ronan _____ ,
Name of Candidate (include all prior names used in the past 5 years, excluding marriage name changes)

the undersigned, hereby declare under penalty of election falsification that my voting residence address is

_____1574 Riverbend Road_____ , _____Columbus_____ , Ohio _____43223_____ , and I am a qualified elector.
Street Number and Address (or rural route and number, if any)     City or Village              Zip Code

I further declare that I desire to be a candidate for nomination to the office of Representative to Congress as a

member of the _____Republican_____ Party from the _____15_____ District for the: Check one [X] full term or [ ] unexpired
                    Political Party                   District Number

term ending _____ , at the primary election to be held on the _____5_____ day of _____May_____ , _____2026_____ .
              Unexpired Term Ending Date                                              Day              Month        Year

I further declare that, if elected to this office or position, I will qualify therefor, and that I will support and abide by the

principles enunciated by the _____Republican_____ Party.
                              Political Party

Dated this _____28_____ day of _____October_____ , _____2025_____ .
              Day                  Month              Year              _____
                                                                        Signature of Candidate

**WHOEVER COMMITS ELECTION FALSIFICATION IS GUILTY OF A FELONY OF THE FIFTH DEGREE**

(*Id.*).

On February 17, 2026, the BOE found Mr. Ronan qualified to appear as a candidate for the Republican primary and certified his candidacy. (Verified Compl., ¶ 1.)

## B.    Protest Against Mr. Ronan's Candidacy

Ohio law allows a qualified elector to protest the candidacy of a party candidate. Ohio Rev. Code § 3513.05. Once a valid protest is lodged, county election officials conduct a hearing, and it can invalidate the protested candidate if, among other reasons, the candidate "has not fully complied with [Ohio election laws]." *Id.*

On February 20, Mark Schare filed a protest against Mr. Ronan's candidacy, claiming Mr. Ronan misrepresented his affiliation with the Republican Party on his declaration of candidacy. (Verified Compl., ¶¶ 4–5; Ex. A, PAGEID # 18.) As evidence of the falsity of Mr. Ronan's declaration of candidacy, Mr. Schare pointed

5

to Mr. Ronan's prior statements from 2017 and 2018 about his strategy to "trick"

Republicans into voting for Democrats. (ECF No. 27-1, PAGEID # 495–96.) He also

presented the following screenshot of a January 2026 Facebook post by Mr. Ronan:



(ECF No. 31-3, PAGEID # 1242.) Relying on this post and Mr. Ronan's past

statements, Mr. Schare argued that Mr. Ronan did not declare himself to be a

Republican in good faith when he signed his declaration of candidacy, so Mr.

Ronan's candidacy should be invalidated for violation of Ohio law. (ECF No. 27-1, PAGEID # 484–85.)

On March 6, the BOE held a hearing on the protest. Prior to the hearing, Mr. Ronan moved to disqualify Ms. Freedhoff because she is the chair of the FCRP, which had financially and publicly supported his primary opponent. (Verified Compl. ¶¶ 16–19.) The BOE unanimously denied the motion to disqualify.

Mr. Ronan testified at the protest hearing, admitting to previously stating that his strategy was to have Democrats run as Republicans in Republican-leaning districts. (March 6 Hr'g Tr., PAGEID # 288–91.) But he said that his January 2026 statement was taken out of context; now he is not "fighting on behalf of the traitorous Democrats" who voted for ICE funding, but he is otherwise following the arguments he made when running for DNC Chair. (*Id.*, PAGEID # 291–95.) He testified that he is running as a Republican in the way he understands the Party's ideals and that he should be able to present his progressive ideology as a Republican and let the voters decide "what is or what is not Republican." (*Id.*, PAGEID # 313–14.)

The BOE split its vote along party lines on the protest, causing a tie. (ECF No. 27-1, PAGEID # 628.) The BOE submitted the protest to Secretary LaRose to break the tie pursuant to Ohio Revised Code § 3501.11(X). (ECF No. 26-2, PAGEID # 362.)

On March 19, 2026, Secretary LaRose issued a letter decision, stating:

> As Board Members Preisse and Freedhoff argued in their letter explaining their vote, the issue here is not "ideological purity."

> Members of political parties are obviously free to disagree internally about a range of issues, and my decision does not suggest otherwise. However, this case presents questions about the integrity of the electoral process. As Members Preisse and Freedhoff point out, Mr. Ronan has "openly and repeatedly" stated that he (and others) should run as Republicans, not because they are Republicans, but so that Democrats can get a foothold in Republican-leaning districts. The goal of his scheme is to get voters to vote for Democrats, believing they are voting for Republicans…. To be clear, candidates can change party affiliation (See R.C. 3513.191). Here, however, Mr. Ronan's statements do not show a change in affiliation but instead highlight his ongoing mission to run Democrats as Republicans to infiltrate the party.

(*Id.*, PAGEID # 362–63.) The Secretary broke the tie in favor of the protest, thereby disqualifying Mr. Ronan from appearing on the May 2026 primary ballot. (*Id.*, PAGEID # 363.)

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 65 governs the issuance of a preliminary injunction. "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *see also EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 874 (6th Cir. 2025) (quoting *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345–46 (2024)). "The purpose of a preliminary injunction, unlike a permanent one, is to prevent any violation of the plaintiff's rights before the district court enters a final judgment." *Resurrection Sch. v. Hertel*, 35 F.4th 524, 528 (6th Cir. 2022), *cert. denied*, 143 S. Ct. 372 (2022) (further quotation omitted).

Courts examine four factors when deciding whether to issue a preliminary injunction: (1) whether the plaintiff has established a strong likelihood of success on

the merits; (2) whether the plaintiff would suffer irreparable injury without a preliminary injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the requested injunction. *EOG Res.*, 134 F.4th at 874 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Although courts generally "balance" these four factors, a plaintiff must prove all four to prevail. *Id.* at 885 (citing *Winter*, 555 U.S. at 20.)

## III.  ANALYSIS

### A.  Likelihood of Success on the Merits

#### 1.  First Amendment Claim

Plaintiffs argue that the decision to remove Mr. Ronan from the ballot based on his past political speech and association violated their rights to free speech and association guaranteed by the First and Fourteenth Amendments. They bring both a facial challenge and an as-applied challenge to Ohio Revised Code § 3513.07.

##### a)  The Court need not abstain under *Pullman.*

As a threshold matter, the State argues that the Court should abstain from ruling on Plaintiffs' First Amendment claim under *Pullman* because Ohio law is unsettled as to whether a candidate's declaration of candidacy affiliation under § 3513.07 must be made in good faith. (ECF No. 27, PAGEID # 444.)

In *Railroad Commissioners of Texas v. Pullman Co.*, 312 U.S. 496 (1941), the Supreme Court held that a federal court should abstain from unnecessarily deciding a federal constitutional claim if it is premised on an unsettled question of state law. 312 U.S. at 501. Courts typically abstain under *Pullman* when there is an action pending in state court that will likely resolve the state-law question underlying the

federal claim or when the state law question concerns "matters peculiarly within the province of local courts." *Harris Cty. Comm'rs Court v. Moore*, 420 U.S. 77, 83–84 (1975). Conversely, when it is unlikely that resolution of the state-law question would "significantly affect the federal claim," abstention is not required. *Id.*

Abstention is not appropriate here.[3] First, though the parties dispute whether Ohio Rev. Code § 3513.07 requires a candidate to declare their partisan affiliation in good faith, the Court does not find the statute's application to be unsettled. The State argues that, because Ohio law requires an independent candidate to disaffiliate in "good faith," the law must also require a candidate to affiliate in good faith. The State points to Ohio Revised Code § 3513.257, which requires an independent candidate – defined in Ohio Revised Code § 3501.01(I) as "any candidate who claims not to be affiliated with a political party" – to file a statement of candidacy the day before the primary election. Courts have interpreted that provision to imply a requirement that a candidate claiming to be an independent is doing so in good faith. *See Morrison v. Colley*, 467 F.3d 503, 509 (6th Cir. 2006) (someone interpreting Ohio Revised Code §§ 3513.257 and 3501.01(I) "would understand that an aspiring independent candidate 'must actually be

_____

[3] To be sure, when a case involves a First Amendment facial challenge to a statute and that statute is not susceptible to a limiting construction, then abstention is generally inappropriate. *See City of Houston, Tex. v. Hill*, 482 U.S. 451, 467 n.17 (1987) (collecting cases). In other words, facial First Amendment challenges involve no question of state law that would avoid or modify the constitutional question before the federal court – by definition. Because Plaintiffs bring both a facial *and* an as-applied challenge, however, the Court will consider the applicability of *Pullman*.

independent, rather than merely claim it'" and that "the claim of independence must be made in good faith—otherwise there would be no reason for having the claim requirement").

But the same is not true of candidates seeking nomination in a partisan primary, who, under Ohio Rev. Code § 3513.07, declare (rather than claim) their party affiliation. *Cf. Jolivette v. Husted*, 694 F.3d 760, 770 (6th Cir. 2012) (Section 3513.191 of the Ohio Revised Code allows candidates previously affiliated with a political party to run in a different party's primary under certain defined circumstances. In contrast, the eligibility of candidates seeking to disaffiliate from a political party and run as independents is governed by the 'good faith' standard as explained in *Morrison*[.]") (citation omitted). Indeed, when a person identifies their party affiliation on their declaration of candidacy, the requirement to do so in "good faith" is not implied; rather, Ohio Revised Code § 3599.36 explicitly prohibits a candidate from knowingly making a false statement, "including a statement required for verifying or filing any declaration of candidacy," such as party affiliation. Accordingly, there is nothing unsettled about the application of Ohio Rev. Code § 3513.07.

But even if the application of § 3513.07 were unsettled, there is still a constitutional issue for the Court to resolve. Regardless of whether "good faith" or honest affiliation is required by the statute, the issue is whether the statute, facially or applied, violates Mr. Ronan's First Amendment speech or associational

11

rights.[4] Abstention is thus improper, so the Court will proceed to Mr. Ronan's likelihood of success on this claim.

### b) Mr. Ronan does not have a likelihood of success on the merits of their facial challenge to § 3513.07.

"Generally, to succeed in a typical facial attack, a plaintiff must establish that no set of circumstances exists under which the statute would be valid. Or, a plaintiff would have to establish that the statute lacks any plainly legitimate sweep." *Speet v. Schuette*, 726 F.3d 867, 872 (6th Cir. 2013) (internal citations and quotations omitted). However, "[w]here a plaintiff makes a facial challenge under the First Amendment to a statute's constitutionality, the 'facial challenge' is an 'overbreadth challenge.'" *Id.* (quoting *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009) (en banc)). "Instead of having to prove that no circumstances exist in which the enforcement of the statute would be constitutional, the plaintiff bears a lesser burden: to demonstrate that a substantial number of instances exist in which the law cannot be applied constitutionally." *Id.* (internal quotation marks omitted). Nevertheless, invalidation for overbreadth is "strong medicine" that is not to be "casually employed." *U.S. v. Williams*, 553 U.S. 285, 293 (2008) (quoting *Los Angeles Police Dept. v. United Reporting Publishing Corp.*, 528 U.S. 32, 39 (1999)).

---

[4] For the same reason, the State's argument that the Court lacks jurisdiction to enjoin state officials for alleged violations of state law under *Pennhurst* is not well taken. (ECF No. 27-1, PAGEID # 445–46.) This Court has jurisdiction to consider whether state officials violated the First Amendment and afford prospective relief.

A court's "first task" on a facial challenge is to determine whether the challenged statute reaches a substantial amount of constitutionally protected conduct. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982). "If it does not, then the overbreadth challenge must fail." *Id.* "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). Instead, "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Id.* at 801 (citations omitted).

Here, Plaintiffs have not identified any other instances in which § 3513.07 cannot be constitutionally applied. They have not shown that there is any danger that the statute itself will "significantly compromise recognized First Amendment protections of parties not before the Court." *Id.* at 800–01. As such, they have not shown a likelihood of success on the merits of their claim that § 3513.07 is unconstitutional on its face.

### c) Mr. Ronan does not have a likelihood of success on the merits of his as-applied challenge to § 3513.07.

To determine whether § 3513.07 violates the First Amendment, the Court uses the framework set out by the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). *See, e.g.*, *Daunt v. Benson*, 956 F.3d 396, 407 (6th Cir. 2020) ("The *Anderson-Burdick* test may apply to

First Amendment claims. … At bottom, the *Anderson-Burdick* framework is used for evaluating state election laws." (citation modified)).

Under *Anderson/Burdick*, "a court must: (1) evaluate whether an election restriction imposes a severe or incidental burden; (2) assess the state's interests in the restriction; and (3) ask if the state's interests make the burden necessary." *Kowall v. Benson*, 18 F.4th 542, 546 (6th Cir. 2021). The level of scrutiny applied "is determined by the magnitude of the burden." *Brown v. Yost*, 133 F.4th 725, 736 (6th Cir. 2025). If the burden is severe, "the regulation will be upheld only if it is 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* (citing *Burdick*, 504 U.S. at 434). On the other hand, "'[t]he State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions.'" *Id.* (quoting *Anderson*, 460 U.S. at 788). There is no "'litmus-paper test' that will separate valid from invalid restrictions." *Anderson*, 460 U.S. at 789. Rather, a court must analyze each factor, as "there is 'no substitute for the hard judgments that must be made.'" *Id.* (citations omitted).

### i. § 3513.07 imposes only an incidental burden on the First Amendment.

The Court must first determine the exact nature of the burden that § 3513.07 places upon party primary candidates and their supporters. *See Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 586 (6th Cir. 2006). Courts measure the magnitude of the burden imposed by considering the rights at issue, "including whether alternative means are available to exercise those rights; the effect of the regulations on the voters, the parties and the candidates; evidence of the real impact the

restriction has on the process; and the interests of the state relative to the scope of the election." *Id.* at 587.

Ohio's election laws govern party affiliation and partisan primary elections. Party affiliation is "purely a matter of self-identification, and that self-identification is subject to change*." State ex rel. Stevens v. Fairfield Cty. Bd. of Elections.*, 99 N.E.3d 376, 382 (Ohio 2018). Indeed, a prospective candidate can run in a partisan primary regardless of the candidate's prior political affiliation so long as he does not currently hold elected partisan office and is otherwise qualified under Ohio law. *See* Ohio Rev. Code §§ 3513.191(B)–(C). A prospective candidate for nomination for a partisan primary formally effectuates this self-identification by declaring he is a member, and intends to support the ideals, of the political party for which he seeks nomination. Ohio Rev. Code § 3513.07; *see, e.g., State ex rel. Bible v. Bd. of Elections. of Hamilton Cty.*, 258 N.E.2d 227, 229 (Ohio 1970) ("Anyone can declare that he is a member of a given political party … [and] if such person can obtain sufficient signatures to his petitions he may run as a primary candidate for office as a member of that party irrespective of the wishes of the party itself.").

But § 3513.07 is a "check" on a prospective candidate's affiliation; the candidate must submit a declaration under the penalty of election fraud stating, in part, that he is a member of the political party for which he seeks nomination and, if elected, he will support and abide by the principles of that party. The statute is not a litmus or ideology test. It does not prohibit a candidate from donating to another campaign, publicly supporting another candidate or a cause, making or

15

publishing statements, or voting. Rather, the statute uniformly requires any prospective primary candidate seeking to run in a partisan primary to truthfully attest under penalty of election falsification that he is a member of said party. And to the extent a prospective candidate does not identify with a party, he can run as an independent.

Summarizing the statutory framework, candidates may "self-identify" with a political party for a primary election, and election officials generally must take them at their word. That said, where, as here, the candidate later states that he does not self-identify with the party he included on his declaration, election officials can use that speech to remove him from the ballot.[5]

Accordingly, the Court finds that § 3513.07 imposes a reasonable, nondiscriminatory, and minimal burden on Mr. Ronan's First Amendment rights and is subject to rational basis review.

### ii.     The State has a substantial interest in regulating its elections.

The Court must next identify and evaluate the State's interest in the restrictions imposed by § 3513.07. *Michigan State A. Philip Randolph Inst. v. Johnson*, 749 F. App'x 342, 349 (6th Cir. 2018). According to Defendants, the statute

---

[5] Take, for example, a candidate declared that he lives in Ohio, but it is later uncovered that he lives in Georgia. Mr. Ronan agrees that such a lie would authorize the State to remove that candidate from the primary ballot. (ECF No. 34, PAGEID # 1317.) Mr. Ronan thus concedes that the State has a mechanism to enforce a fraudulent declaration submitted under § 3513.07, just as Defendants did here.

16

serves Ohio's interest in party integrity, ballot clarity, and the orderly administration of elections. (ECF No. 27, PAGEID # 447.)

Ohio has a substantial interest in barring prospective primary election candidates from fraudulently attesting they belong to a political party that they do not. *See, e.g., John Doe No. 1 v. Reed*, 561 U.S. 186, 197 (2010) ("The State's interest in preserving the integrity of the electoral process is undoubtedly important."); *Citizens for Tax Reform v. Deters*, 518 F.3d 375, 387 (6th Cir. 2008) ("[E]liminating election fraud is certainly a compelling state interest[.]"); *Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 297 (6th Cir. 1993) ("[A] state has a strong interest in ensuring that its elections are run fairly and honestly." (citation modified)). And, a state may properly require party labels to be included on the ballot; if it does so, it can provide meaningful guardrails around the use of such label. *See Schrader v. Blackwell*, 241 F.3d 783, 789 (6th Cir. 2001) ("[P]arty labels provide a shorthand designation of the views of party candidates on matters of public concern," such that "the identification of candidates with particular parties plays a role in the process by which voters inform themselves.").

Accordingly, the Court finds that the State has a substantial interest in preserving the integrity of its elections.

### iii. The State's interest necessitates the burden here.

There is no doubt that Mr. Ronan is entitled to publicly espouse his political views and associate with like-minded individuals. But this case is limited to the

unique facts presented here, and the State's interest outweighs the minimal burden § 3513.07 imposes on Mr. Ronan's First Amendment rights.

Only after a qualified elector challenged the validity of Mr. Ronan's candidacy did the BOE consider Mr. Ronan's speech. During the hearing, evidence was submitted of a statement Mr. Ronan made *after* he signed his declaration of candidacy, where he admitted to following a strategy to run Democrats as Republicans in "deep red districts" so that Democrats could win. (ECF No. 27-1, PAGEID # 586–87.) His statement directly conflicted with his declaration of candidacy, where he affirmed his membership in the Republican Party and his intent to uphold the Party's ideals. Based on this objective evidence of direct contradiction, Secretary LaRose determined that Mr. Ronan's declaration was false.

Mr. Ronan argues that the State impermissibly used his prior political positions and core political speech to subjectively decide that he was not a "true Republican." But Mr. Ronan's argument ignores the facts presented. Had the Secretary relied solely on Mr. Ronan's prior statements, his allegedly disparate political ideology, or a more ambiguous statement, the outcome would certainly be different. But state elections officials are not required to ignore his statements that directly and simultaneously contradict his declaration that he is a Republican. *See Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) ("The First Amendment … does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent."); *see also United States v. Fox*, 134 F.4th 348, 369 (6th Cir.

18

2025) ("A defendant cannot use the First Amendment as a shield to disguise criminal conduct[.]").

Mr. Ronan's argument also ignores the State's substantial interest in regulating its elections. It is well established that "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *see also Storer v. Brown*, 415 U.S. 724, 730 (1974) ("[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process."). It cannot be said that *any* burden on Mr. Ronan's First Amendment rights is, per-se, too high. Rather, the "State's asserted regulatory interests need only be 'sufficiently weighty to justify the limitation' imposed on the party's rights." *Timmons*, 520 U.S. at 364 (citation omitted).

To that end, to the extent Mr. Ronan argues that the State cannot enforce a fraudulent declaration submitted under § 3513.07, he is wrong. It cannot be the case that a State must allow a candidate on a partisan ballot even if he lied about his party affiliation simply because the First Amendment is implicated. To do so "would subject virtually every electoral regulation to strict scrutiny, hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes." *Morrison v. Colley*, 467 F.3d at 506. But "[t]he Constitution does not require that result." *Id.*

19

The cases on which Mr. Ronan relies do not counsel a different result. First, in *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 469–70 (6th Cir. 2016), the Sixth Circuit addressed Ohio's political false-statements laws prohibiting dissemination of false information about a political candidate. Those laws, "[o]n their face … target[ed] speech at the core of First Amendment protections—political speech." *Id.* at 473. Because "Ohio's laws reach[ed] not only defamatory and fraudulent remarks, but *all* false speech … even that which [was not] material, negative, defamatory, or libelous," the Sixth Circuit applied strict scrutiny and found that the State did not meet its burden. *Id.* But how Defendants have applied § 3513.07 does not target speech in the same way – they did not target *all* of Mr. Ronan's speech but rather only used his contemporaneous statements that were incompatible with his declaration of candidacy. Mr. Ronan's speech was evidence of his fraudulent declaration.

Second, in *Brown v. Yost*, 133 F.4th 725, 728 (6th Cir. 2025), the Ohio Attorney General rejected the summary included in a proposed constitutional amendment because it was not "fair and truthful," preventing the amendment's proponents from collecting signatures to place the amendment on the ballot. Applying *Anderson/Burdick*, the Sixth Circuit found that the Attorney General's "fair-and-truthful certification" severely burdened plaintiffs' First Amendment rights because it amounted to editorial review of core political speech. *Id.* at 736. The Court rejected the Attorney General's argument that it was only a modest burden of speech because the law regulated only the speech in the petition

20

summary. *Id*. However, the *Brown* plaintiffs were being forced to circulate a summary that conflicted with their view of the proposed constitutional amendment. *Id*. at 737. The Sixth Circuit applied strict scrutiny and found that plaintiffs were likely to succeed on their facial and as-applied challenges. *Id*.

Unlike *Brown*, the statute here does not require Mr. Ronan's speech to undergo editorial review for him to be permitted to run as a Republican. It does not authorize the State to tell Mr. Ronan what he can or ought to say. Instead, the statute provides that if Mr. Ronan voluntarily submits a sworn declaration, that declaration must be truthful. And if his later speech objectively proves the declaration was falsely submitted, then he will be removed from the ballot. Not because of the content of his speech, but because of the falsity of his declaration.

\* \* \*

Because the State's well-established interest in administering its elections outweighs the minimal burden imposed here, the Court finds that Mr. Ronan is unlikely to succeed on the merits of their First Amendment claim.

### 2. Elections Clause Claim

Article I, § 4 of the United States Constitution provides that the "Times, Places and Manner of holding Elections for Senators and Representatives shall be prescribed in each State by the Legislature thereof." U.S. Const. art. I, § 4, cl. 1. Known as the Elections Clause, this provision gives state governments the default responsibility to regulate the mechanics of federal elections, while granting

21

Congress the power to override state regulations. *Foster v. Love*, 522 U.S. 67, 69 (1997).

"[P]rivate plaintiffs lack standing to sue for alleged injuries attributable to a state government's violations of the Elections Clause." *Bognet v. Sec'y Commonwealth of Penn.*, 980 F.3d 336, 349 (3d Cir. 2020), *vacated as moot sub nom. Bognet v. Degraffenreid*, 145 S. Ct. 2508 (2021); *see also Texas Voters Alliance v. Dallas Cty.*, 495 F. Supp. 3d 441, 462 (E.D. Tex. 2020) ("Any rights and corresponding remedies for Elections Clause violations must therefore arise from laws enacted by Congress pursuant to its authority under the Elections Clause. Simply put, no cause of action based solely on the text of the Elections Clause exists for Plaintiffs to plead.").

Because there is no private right of action to enforce a violation of the Elections Clause, Mr. Ronan is unlikely to succeed on his second claim. Even assuming he could pursue such a claim, it would likely fail for the same reasons that his First Amendment claim likely fails. The Elections Clause gives States the authority to "enact numerous requirements as to procedures and safeguards which experience shows are necessary in order to enforce the fundamental right involved." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 834 (1995) (citation omitted). States may adopt generally applicable restrictions to protect the integrity of the electoral process so long as the restrictions do not abridge fundamental rights. *Id.*

Mr. Ronan fails to show he is likely to succeed on the merits of his Elections Clause claim.

22

### 3.    Due Process Claim

The Due Process Clause of the Fourteenth Amendment protects a person against the deprivation of a protected life, liberty, or property interest without affording him adequate procedural rights. *See EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012).

The Court concludes that Mr. Ronan's due process claim is unlikely to succeed for two reasons. First, Mr. Ronan does not have a protected interest in falsely claiming his party affiliation to appear on the ballot. Second, even if he had a protected interest, he has failed to show that the process afforded him was insufficient.

As to the former, courts regularly find that a candidate for political office holds no protected interest in an elected position. *See Newsom v. Golden*, 602 F. Supp. 3d 1073, 1083 (M.D. Tenn. 2022) (collecting cases). Assuming Ohio law created a legitimate claim of entitlement to appear on the ballot that would support finding a protected property interest, that entitlement is circumscribed by the candidate complying with the provisions set forth in Chapter 35 of the Ohio Revised Code. *See* Ohio Rev. Code § 3513.05 ("If…[a] candidate…has not fully complied with this chapter, the candidate's declaration of candidacy and petition shall be determined to be invalid and shall be rejected…"). For the reasons set forth above, Mr. Ronan is not entitled to appear on the ballot as a Republican while stating he is doing so to infiltrate the Republican Party.

23

With regard to the latter, "[i]t is axiomatic that a fair trial in a fair tribunal is a basic requirement of due process." *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 876 (2009) (citation omitted). A person has a due process right to a hearing before a decision maker "with no direct, personal, substantial pecuniary interest in the outcome." *Carey v. Wolnitzek*, 614 F.3d 189, 204 (6th Cir. 2010) (citation omitted). Accordingly, the Due Process Clause "guarantees an absence of actual bias on the part of a judge." *Johnson v. Morales*, 946 F.3d 911, 918 (6th Cir. 2020) (citation omitted). "Judicial bias is a deep-seated favoritism or antagonism that makes fair judgment impossible." *Coley v. Bagley*, 706 F.3d 741, 750 (6th Cir. 2013). This guarantee against judicial bias applies equally to quasi-judicial proceedings (e.g., a hearing before a board of elections). *See Schweiker v. McClure*, 456 U.S. 188, 195 (1982). When the "probability of actual bias rises to an unconstitutional level," recusal is required. *Coley*, 706 F.3d at 750 (citation omitted). But the Constitution only mandates recusal in an "extraordinary situation." *Caperton*, 556 at 887.

Claims of bias start with "a presumption of honesty and integrity in those serving as adjudicators" *Johnson*, 946 F.3d at 918 (citation omitted). Courts use an objective standard to evaluate whether judicial bias is constitutionally intolerable, asking "not whether the judge is actually, subjectively biased, but whether the average judge in [her] position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Caperton*, 556 U.S. at 881. For example, courts have found an actual risk of bias where a judge received significant campaign

24

contributions from a litigant, *see Caperton*, 556 U.S. at 872, or had "significant personal involvement as a prosecutor in a critical decision regarding the defendant's case," *see Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016). Conversely, "generalized assumptions of possible interest" based on "various connections" to interested parties are insufficient to establish unconstitutional bias. *Schweiker*, 456 U.S. at 196.

Mr. Ronan argues that Ms. Freedhoff was unconstitutionally biased against him due to her involvement with the FCRP, which has contributed to and supported his primary opponent. (Verified Compl., ¶ 56.) He claims that, as a result of FCRP's "receipt of thousands of dollars from Carey's campaign" and the Ohio Republican Party's ("ORP") "undisclosed secret involvement" in the protest against Mr. Ronan's candidacy, Ms. Freedhoff should have recused from the BOE's consideration of the protest against his candidacy. (*Id.*, ¶¶ 56–57.)

These arguments fail for several reasons. First, association with a political party that supports Mr. Ronan's opponent does not, on its own, demonstrate that there is a risk of bias so great to require recusal. *See, e.g., Republican Party of Minn. v. White*, 416 F.3d 738, 755 (8th Cir. 2005) ("[T]he fact that the matter comes before a judge who is associated with the Republican or Democratic Party would not implicate concerns of bias for or against that party unless the judge were in some way involved in the case beyond simple having an 'R' or a 'D'…after his or her name.").

Second, Ohio law specifically contemplates some level of partisanship on the part of members of a board of elections by requiring partisan balancing of board members. Ohio Revised Code § 3501.09 specifies that

> The director and deputy director [of the BOE] shall be of opposite political parties, and each such officer shall have been nominated by a board member of the political party to which he belongs…. After the selection of the director and deputy director, the chairman shall be selected from the members of the board of opposite politics to that of the director.

Ohio Rev. Code § 3501.09. Mere political connections to an interested party do not, absent personal involvement in the matter being decided, overcome the presumption of the decision maker's neutrality.

Here, the parties agree that Ms. Freedhoff was not personally involved in the opponent's campaign or the protest. She did not "receive any instruction, direction, or request" from the FCRP, the ORP, or the Carey campaign regarding the protest. (*See* Stipulations, ECF No. 30, PAGEID # 1235–36.) There is no evidence that she knew the ORP was paying the legal fees for the protest. (*Id.*, PAGEID # 1234.) Moreover, the contributions Mr. Ronan identifies as evidencing a risk of bias were made to the FCRP, not to Ms. Freedhoff, who had no personal financial interest in the outcome in the protest and received no benefit as a result. (*Id.*, PAGEID # 1236.) Rather, Mr. Ronan's arguments rest solely on the kind of "generalized assumption of possible interest" from connections to an interested party that the Supreme Court has held are insufficient to establish unconstitutional bias. *Schweiker*, 456 U.S. at 196.

Mr. Ronan has not shown that he is likely to succeed on the merits of this claim.

### B.      Irreparable Injury

When a plaintiff has fails to show a likelihood of success on the merits of his constitutional claim, the argument that he is irreparably harmed by the deprivation of his constitutional rights also fails. *McNeilly v. Land*, 684 F.3d 611, 621 (6th Cir. 2012).

### C.      Balance of the Equities

Because Plaintiffs seek an injunction against a state government, the final two preliminary injunction factors (harm to third parties and the public interest) are considered together. *Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*, 162 F.4th 631, 643 (6th Cir. 2025).

Mr. Ronan argues that there will be no harm to others if he was on the ballot, and the public interest will be served by allowing registered voters to vote for him. (Mot., PAGEID # 71.) However, the public interest would not be served by allowing a candidate to appear on the ballot after the State has determined he falsified his declaration of candidacy.

## IV.    CONCLUSION

For the reasons stated herein, the Motion for Preliminary Injunction is **DENIED,** and the Temporary Restraining Order is **VACATED**.

    **IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**