**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| SAMUEL RONAN and<br>ANA CORDERO<br>Plaintiffs, | |
| v. | **Case No. 2:26-cv-343** |
| FRANK LaROSE, in his official capacity as Secretary of State of Ohio, | **Chief Judge Sarah D. Morrison** |
| DOUGLAS J. PREISSE, in his official Capacity as Chair of the Franklin County Board of Elections, | **Mag. Judge S. Courter M. Shimeall** |
| MEREDITH FREEDHOFF, in her official Capacity as Member of the Franklin County Board of Elections, | |
| JAMIE L. SHUMAKER, in her official Capacity as Member of the Franklin County Board of Elections, and | |
| MICHAEL E. SEXTON, in his official Capacity as Member of the Franklin County Board of Elections, | |
| Defendants. | |

**VERIFIED FIRST AMENDED COMPLAINT**
**FOR DECLARATORY AND**
**INJUNCTIVE RELIEF**

**Facts and Parties**

1. Plaintiff, Samuel Ronan, was certified by the Franklin County Board of Elections, whose four members are Defendants sued in their official capacities and who at all relevant times were acting under color of Ohio within the meaning of 42 U.S.C. §1983 and engaged in state action within the meaning of the First and Fourteenth Amendments to the United States Constitution, as

a ballot-qualified candidate for Ohio's Republican Party May 5, 2026 primary election to fill Ohio's 15th Congressional District on or about February 17, 2026. *See* Frankin County Board of Elections, Certified Candidates, May, 6, 2026 Primary Election, https://vote.franklincountyohio.gov/getmedia/d6820021-1845-49a3-8340-1541ca9f683e/2026-Primary-Certified-Candidates-6.

2. Ronan had timely satisfied to the satisfaction of the Franklin County Board of Elections all of the objective requirements required by Ohio to run in the May 5, 2026 Republican primary for Ohio's 15th Congressional District and had truthfully declared pursuant to O.R.C. § 3513.07 both "I am a member of the Republican Party" and "I further declare that, if elected to said office or position, I will qualify therefor, and that I will support and abide by the principles enunciated by the Republican Party."

3. Plaintiff, Ana Cordero, intended to vote in the Republican party's 15th Congressional District Republican primary on May 5, 2026 for Plaintiff-Ronan.

4. On February 20, 2026 Plaintiff-Ronan's candidacy was protested by a qualified Republican voter by the name of Marc A. Schare. *See* Exhibit A.

5. Based on Plaintiff-Ronan's past political positions and political statements, Schare's protest claimed that Ronan was not in fact a true Republican and did not intend to abide by Republican principles if elected even though Ronan declared in his nominating papers that he was a Republican and intended, if elected, to abide by Republican party principles. *See* Exhibit A.

6. Schare's attorneys at the March 6, 2026 hearing singularly argued to the Board of Elections that Plaintiff-Ronan should be removed from the ballot because he had not truthfully declared pursuant to O.R.C. § 3513.07 both that he is "a member of the Republican Party" and "if

elected to said office or position, I will qualify therefor, and that I will support and abide by the principles enunciated by the Republican Party."

7. Schare's attorneys argued to the Secretary of State in a letter dated March 13, 2026 following the Board of Elections tie vote (described below) that "Ohio law does not and should not allow a candidate to intentionally lie about their party affiliation. … If Ronan is permitted to appear on the Republican ballot against the backdrop of this body of evidence, the mandatory declaration to 'support and abide by the principles' of the Republican Party is meaningless." *See* Exhibit B.

8. The ostensible protestor, Schare, testified at the hearing on March 6, 2026 before the Board of Elections that he did not sign the protest, did not write it, did not deliver it, and was not responsible for paying the three attorneys whose names were listed as contacts and who identified themselves as representing Schare on the bottom of the written February 20, 2026 protest.

9. At the March 6, 2026 hearing held before the Franklin County Board of Elections, Schare testified under oath not only that he was not paying his lawyers but that he did not know who was paying his lawyers.

10. Schare's attorney at the March 6, 2026 hearing interrupted questioning of Schare to object to any inquiry into who was paying Schare's lawyers and represented to the Board of Elections that Schare's lawyers had fully complied with Ohio's Rules of Professional Conduct, which require that lawyers disclose to their clients who is paying for the clients' representation.

11. Neither Plaintiff-Ronan nor the Board of Elections was told at or before the March 6, 2026 hearing that the Ohio Republican Party was the real party in interest that was paying Schare's legal bills for the protest against Plaintiff-Ronan.

12. At the March 6, 2026 hearing before the Board of Elections, Plaintiff-Ronan testified under oath that his declaration of membership in the Republican party was truthful, that his declaration of intent to abide by, if elected, the principles of the Republican party was truthful, and that his political positions are consistent with historical Republican principles. As an example he read from and reiterated his statements made in an interview published in 2024 by Alabama Public Radio when he challenged former President Trump in the Republican presidential primary:

> Ronan said he chose to run on the GOP ballot for this election because his policies and values align more with that party.
>
> "I believe my values are actually better received in the Republican Party. So, I am choosing to run as a Republican. Now, taking it a step further, I'm choosing to run as a Republican because the current cadre of candidates do not represent the needs and the ideals of the American people," he said. "In fact, the frontrunner [Donald] Trump is offering despotism dictatorship and worse, whereas the four other candidates are offering watered down versions of some or all of his policies."
>
> Another reason Ronan said he chose to run on the Republican ballot is because the party is open to hearing new ideas from their candidates. "The Republican Party, for all of the faults or all of its good, is open to varying ideas," he explained. "They do not prevent people from running. They do not close their primaries, and they do not deny the winner their victory so they can have their preferred candidate in place.
>
> My values match the Republican Party of yesterday. I feel that I represent the history of the Republican Party, the true value of where the Republican Party thrived back during the [Dwight D.] Eisenhower years," Ronan said.

*See* Exhibit C.

13. At the March 6, 2026 hearing before the Board of Elections Plaintiff-Ronan reiterated under oath that he was self-identifying as a member of the Republican party and intended, if elected, to abide by the principles of the Republican party.

14. At the March 6, 2026 hearing, Defendant-Freedhoff, a member of the Board of Elections, questioned Plaintiff-Ronan extensively about the past political positions he had taken

when he ran against former President Donald Trump in the Republican primary in 2024. *See* Exhibit C.

15. Defendant-Freedhoff raised a number of Plaintiff-Ronan's statements from his Republican candidacy in 2024 against Trump and stated that she found Plaintiff-Ronan's statements to be incompatible with the principles of the Republican party.

16. Before the March 6, 2026 hearing before the Board of Elections, Plaintiff-Ronan on February 27, 2026 timely moved to disqualify Defendant-Freedhoff from participating in the protest, a motion to disqualify that was rejected by Defendant-Freedhoff.

17. Plaintiff-Ronan's disqualification motion was premised on Defendant-Freedhoff's being the chair of the Franklin County Republican Party, which had contributed to, received money from, and otherwise supported Plaintiff-Ronan's Republican opponent, Mike Carey, in the May 5, 2026 primary.

18. Financial records downloaded by Plaintiff-Ronan from the Federal Election Commission (FEC) establish that the Franklin County Republican Party contributed $500 to Carey's 2026 congressional campaign in late August 2025, and that Carey's campaign had paid to the Franklin County Republican Party over $10,000 in December 2025. *See* Exhibit D.

19. FEC filings also reveal that Defendant-Freedhoff had herself personally contributed $500 to Carey's 2024 15th congressional district campaign. *See* FEC, https://www.fec.gov/data/receipts/?data_type=processed&committee_id=C00779603&contributor_name=freedhoff&two_year_transaction_period=2024.

20. Unknown to Ronan at the time of the BOE hearing, and not disclosed to him by the Board of Elections or Defendant-Preisse at the time of the hearing or thereafter, Defendant-Preisse had contributed $1000 to Mike Carey's 2026 congressional primary campaign for Ohio's 15th

congressional district. *See* FEC, Receipts, Carey for Congress, https://www.fec.gov/data/receipts/?data_type=processed&committee_id=C00779603 &contributor_name=preisse.

21. The Franklin County Republican Party also at this time had formally endorsed Carey's candidacy. *See* Franklin County Republican Party, Our Endorsed Candidates, https://franklincountygop.org/ *See* Exhibit E.

22. Plaintiff-Ronan on February 25, 2026 timely moved to dismiss the protest based on the protestor's not having signed the protest and on the failure of the protest to state a proper claim under Ohio law, including O.R.C. §§ 3513.07 and 3513.191(B).

23. The Board of Elections at the March 6, 2026 hearing ruled that it did not have the authority to dismiss a protest before a hearing was held and the merits of the protest considered.

24. The Board of Elections tied 2 to 2 over the motion on the floor to deny the protest without being informed that the Ohio Republican Party was the real party in interest paying the legal bills for the protest against Ronan and without either Defendant-Preisse or Defendant-Freedhoff disclosing the financial contributions they had previously personally made to the campaign of Plaintiff-Ronan's lone competitor, Mike Carey.

25. The two Republican members of the Board of Elections, Defendant-Preisse and Defendant-Freedhoff (who had refused to disqualify herself), both of whom had personally contributed to Carey's congressional campaigns, voted against the motion to deny the protest.

26. The two Democratic members of the Board, Defendant-Shumaker and Defendant-Sexton, voted to deny the protest.

27. Because the motion tied 2 to 2, O.R.C. § 3501.11(x) directed that the vote be forwarded to Defendant-Secretary of State, who is sued in his official capacity and who at all

relevant times was acting under color of Ohio within the meaning of 42 U.S.C. §1983 and engaged in state action within the meaning of the First and Fourteenth Amendments to the United States Constitution.

28. On March 10, 2026, after counsel for Plaintiff-Ronan sent to Schare's lawyers on March 7, 2026 a demand for the identity of the real party in interest who was paying the legal bills and directing the protest, along with legal authority from this Court establishing that Plaintiff-Ronan's lawyers had a right to this information, *see Libertarian Party of Ohio v. Husted*, 2014 WL 3928293 (S.D. Ohio 2014), did Schare's lawyers belatedly respond that "our client the Ohio Republican Party will be paying our invoices in connection with this protest."

29. Ronan discovered evidence after he had been removed from the ballot confirming that Mike Carey's campaign was responsible for the Ohio Republican Party's decision to protest his (Ronan's) candidacy before the Franklin County BOE. Specifically, the Carey campaign had contacted the chair of the Ohio Republican Party, Alex Triantafilou, *see* Triantafilou Dep., Doc. 29-1, at PageID# 1223, and "laid out the case for me as to why this was in the party's interest to support Mike Carey," *id*. at 1224, "by spending money on legal fees" to protest Ronan. *Id*. at PageID# 1225.

30. The Secretary of State was notified by Plaintiff-Ronan on March 10, 2026 that the Ohio Republican Party had been identified by Schare's lawyers as the real party in interest and moved Defendant-Secretary to disqualify Defendant-Freedhoff and remand the matter back to the Board of Elections for further proceedings without Defendant-Freedhoff's participation.

31. Defendant-LaRose, who is presently running in Ohio for the Office of State Auditor in the 2026 election, has been officially endorsed for that office by the Ohio Republican Party, which as explained above is the real party in interest in the protest against Ronan. *See* Ohio

Republican Party Slate Card: Official 2026 Ohio Republican Party endorsed candidates, https://ohiogop.org/2026-orp-slate-card/.

32. On March 19, 2026, just one day before the March 20, 2026 deadline for finalizing overseas ballots in Ohio, Defendant-LaRose removed Plaintiff-Ronan from Ohio's primary ballot, stating in an official post from the Office of the Secretary of State:

> Secretary LaRose has decided a tie vote of the Franklin County Board of Elections in favor of a protest against the candidacy of Samuel Ronan, who was seeking the Republican nomination for the office of U.S. Representative in the 15th Congressional District. The board has been informed that Mr. Ronan is no longer a certified candidate for the May 5, 2026 Primary Election, and the board has been instructed to provide proper notice with all ballots that votes for this candidate will not be counted.

*See* Exhibit F.

33. On March 19, 2026, just one day before the March 20, 2026 deadline for finalizing overseas ballots in Ohio, Defendant-LaRose announced his removal of Plaintiff-Ronan from Ohio's primary ballot in a letter sent to the Franklin County Board of Elections. *See* Exhibit G.

34. The March 19, 2026 letter Defendant-LaRose sent to the Franklin County Board of Elections was not sent to Plaintiffs or otherwise provided by Defendants to Plaintiffs before the onset of this litigation on March 20, 2026.

35. Plaintiff-Ronan's removal from the ballot caused him injury-in-fact to his First and Fourteenth Amendment rights and this injury-in-fact was caused by the named Defendants' actions and can be redressed by a favorable decision by this Court within the meaning of Article III of the United States Constitution.

36. Plaintiff-Ronan's removal from the ballot has caused Plaintiff-Cordero injury-in-fact to her right to vote under the First and Fourteenth Amendments and was caused by the named Defendants' actions and can be redressed by a favorable decision by this Court within the meaning of Article III of the United States Constitution.

37. Plaintiff-Ronan intends to run in Ohio Republican Party congressional primaries in Ohio and in Franklin County in 2028 and in the future.

38. Plaintiff-Ronan intends to repeat the same political and ideological messages in his 2028 Ohio Republican Party congressional campaign and in the future when he runs in Ohio Republican Party congressional primaries in Ohio and in Franklin County.

39. Plaintiff-Cordero intends to vote for Plaintiff-Ronan in Ohio Republican Party primaries in Ohio and in Franklin County in 2028 and in the future.

40. Defendants' actions in branding Plaintiff-Ronan a member of the Democratic Party who illegally seeks to "infiltrate" Ohio Republican Party primaries in Ohio has caused Plaintiff-Ronan continuing- and future-injury, said injury being caused by Defendants and which can be redressed by a favorable decision of this Court within the meaning of Article III of the United States Constitution.

41. Plaintiff-Ronan suffers a substantial risk that because of Defendants' past, present and future actions he will be removed from Ohio Republican Party primary ballots in Ohio and Franklin County when he runs in those primaries in 2028 and in the future.

42. Plaintiff-Ronan suffers a substantial risk of future (albeit unconstitutional) criminal election-falsification prosecution because of Defendants' past, present and future actions.

43. A substantial risk of future harm that Plaintiff-Ronan suffers is caused by Defendants' past, present and future actions and can likely be redressed by a favorable decision of this Court within the meaning of Article III of the United States Constitution.

44. Plaintiff-Cordero suffers a substantial risk that because of Defendants' past, present and future actions she will not be able to vote for Plaintiff-Ronan in future Ohio Republican Party primaries in Ohio and Franklin County.

45. But for Defendants' illegal and unconstitutional actions, Plaintiff-Ronan would have qualified for and run in the Ohio congressional Republican Party primary in 2026 against the incumbent, Mike Carey.

46. But for Defendants' illegal and unconstitutional creation of an ideological and political good faith requirement for congressional primary candidates in Ohio, Plaintiff-Ronan would be qualified for and able to run in Ohio congressional Republican Party primaries, including those in Franklin County, in 2028 and in the future.

47. Plaintiff-Ronan is ready, able and qualified to run in Ohio Republican Party congressional primaries in Ohio, including those in Franklin County, in 2028 and in the future, and Plaintiff-Cordero is ready, able and qualified to vote for Plaintiff-Ronan in Ohio Republican Party congressional primaries in Ohio, including those in Franklin County, in 2028 and in the future.

48. Plaintiff-Ronan's and Plaintiff-Cordero's injuries are capable of repetition and yet evading review. *See Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579 (6th Cir. 2006).

49. Defendant-LaRose and the Defendant-Members of the Franklin County Board of Elections, including Defendant-Freedhoff and Defendant-Preisse, are policymaking final authorities whose decision to remove Plaintiff-Ronan and others from the Ohio Republican Party primary ballot because of a lack of ideological or political purity or good faith equates (albeit illegally under Ohio law and unconstitutionally under the United States Constitution) with a decision by the State of Ohio to remove Plaintiff-Ronan from the Ohio Republican Party primary ballot.

50. Defendants are authorized by Ohio law to apply Ohio's ballot access and election laws but are not authorized by Ohio law to alter, modify, add to, subtract from or change those ballot access and election laws for any office.

**Ohio Law and Defendants' Interpretation of Ohio Law**

51. Section 3513.191(B) of the Ohio Revised Code provides in relevant part that "either of the following persons may be candidates for nomination of any political party at a party primary: (1) A person who does not hold an elective office; (2) A person who holds an elective office other than one for which candidates are nominated at a party primary." (Emphasis added).

52. Section 3513.191(B) authorizes any otherwise qualified candidate in Ohio who is not presently holding an elective office to run for office in "any" political party primary.

53. Subsection (B) of § 3513.191 was added in 1995 to expand primary candidates' ballot access rights by removing Ohio's political party qualification requirement.

54. The chief sponsor of the bill (H.B. 99) that would become § 3513.191(B), Representative Scott R. Nein, reported to the House's Campaign Finance Reform Task Force on June 13, 1995 that his proposed change to § 3513.191 (which passed as proposed) "Allows a person to run for election in a party primary regardless of their party affiliation." Memo from Scott R. Nein to Members of the Campaign Finance Reform Task Force, June 13, 1995, at 5 (emphasis added) (attached as exhibit to Brief for Ohio Secretary of State, *State ex rel. Finan v. Blackwell*, No. 05APD-08-0854 (Sept. 6, 2005)) (*See* Exhibit H).

55. Ohio's Secretary of State, Robert Taft, advised election boards following the adoption of the 1995 change to Ohio's ballot access law that the only ideological limitation on a primary candidate following the adoption of 3513.191(B) was the contemporaneously adopted provision in 3513.192, which states that a primary candidate who votes in the contemporaneous primary of a "political party different from the party that nominated the candidate shall forfeit the nomination." *See* Taft Advisory No. 95-10, Aug. 25, 1995, at page 9 (attached as exhibit to Brief

for Ohio Secretary of State, *State ex rel. Finan v. Blackwell*, No. 05APD-08-0854 (Sept. 6, 2005)) (*See* Exhibit H).

56. Following the contemporaneous adoptions of §§ 3513.191(B) and 3513.192 in 1995, Republicans have been and are allowed to run in Democratic primaries and Democrats have been and are allowed to run in Republican primaries.

57. Whether a primary candidate was or remains a member of a different political party is immaterial under Ohio law to that candidate's lawful ability to run in another political party's partisan primary.

58. A primary candidate's declaration of intent to abide by party principles in the future under O.R.C. § 3513.07 and declaration of intent to be a present member of that political party under O.R.C. § 3513.07 cannot constitute election falsification under Ohio law.

59. This Court in *Jolivette v. Husted*, 886 F. Supp. 2d 820, 835 (S.D. Ohio), *aff'd*, 694 F.3d 760 (6th Cir. 2012), determined that because of §3513.191(B) a candidate who seeks to associate with a political party and run in its primary has a right to do so without his or her "good faith" being questioned by protestors, boards of elections or the Ohio Secretary of State; the District Court stated that "there is no requirement that the candidate make the change in good faith, unlike the rule that applies to a candidate who disaffiliates from a party." (Emphasis added).

60. Before the District Court in *Jolivette*, the Defendant-Secretary of State specifically argued that "while it is true that partisan candidates may change parties without input or approval from the board of elections, it is a result of their dissimilarly situated nature." Defendant Secretary of State's Memorandum Contra Plaintiff's Motion for Preliminary Injunction, *Jolivette v. Husted*, No. 12-603, Doc. 19, at PageID# 435 (emphasis added).

61. Before the Sixth Circuit in the *Jolivette* case, Defendant-Secretary of State further explained this same point, focusing on the difference Ohio law draws between partisan primary candidates and independent candidates and the need for an administratively enforceable good faith standard only for the latter: "Other than their shared desire to attain ballot access," Ohio's Secretary explained, "the routes by which partisan and non-partisan candidates attain such access demonstrate their dissimilar natures." Merit Brief of Defendant-Appellee Ohio Secretary of State Jon Husted, *Jolivette v. Ohio Secretary of State*, No. 12-3998 (August 29, 2012), at 12, 2012 U.S. 6th Cir. Briefs Lexis 1111.

62. Specifically, the Secretary of State explained to the Sixth Circuit in *Jolivette*:

> Partisan candidates face a vetting process that exists in the form of a primary election, while independent candidates proceed directly to the general election ballot. (R. 24, p. 26). Thus, because independent candidates are not subject to the rigorous test of a primary election like their partisan counterparts, permitting protests, which are adjudicated by the boards of elections, constitutes a very minor barrier that protects against this danger by ensuring that the independent candidates have asserted their non-affiliation in good faith.

*Id*. at 26.

63. Defendant-Secretary of State's arguments in *Jolivette* and the District Court's and Sixth Circuits' reliance on those arguments to rule in the Secretary's favor estop Defendant-Secretary of State from claiming the exact opposite here, the exact opposite being that Ohio law authorizes boards of elections and the Secretary of State to remove candidates from partisan primary ballots based on their determination that the removed candidate lacked political and/or ideological good faith. *See Parklane Hosiery v. Shore*, 439 U.S. 322 (1979); *In re E.I. DuPont de Nemours & Co. C-8 Personal Injury Litigation*, 54 F.4th 912 (6th Cir. 2022).

64. Defendant-Secretary of State's arguments in *Jolivette* and the District Court's and Sixth Circuits' reliance on those arguments described above to rule in the Secretary's favor estop Defendant-Secretary of State from claiming the exact opposite here, the exact opposite being that

Ohio law authorizes boards of elections and the Secretary of State to remove candidates from partisan primary ballots because those candidates are believed to be members of differing political parties. *See Parklane Hosiery v. Shore*, 439 U.S. 322 (1979); *In re E.I. DuPont de Nemours & Co. C-8 Personal Injury Litigation*, 54 F.4th 912 (6th Cir. 2022).

65. Political party membership in Ohio is determined "purely" by the intent of voters and candidates, respectively. *See State ex rel. Bender v. Franklin County Board of Elections*, 132 N.E.3d 664, 668 (Ohio 2019) ("Party affiliation in Ohio is purely a matter of self-identification, and that self-identification is subject to change."). *See also State ex rel. Young v. Gasser*, 257 N.E.2d 389, 391 (Ohio 1970) ("[P]arty affiliation or membership [in Ohio] is that which [a voter or candidate] desires it to be from time to time."); *Pirincin v. Board of Elections of Cuyahoga County*, 368 F. Supp. 64, 70 (N.D. Ohio 1973) ("In practice Ohio's election laws permit and result in shifting party affiliations.").

66. Nothing in Ohio law prohibits a voter or candidate from identifying with or belonging to more than one political party at the same time.

67. Section 3513.07 of the Ohio Revised Code states that a primary candidate must state in his or her declaration of candidacy filed with elections officials that "I am a member of the ________ Party," after filling in the relevant party's name, and "I further declare that, if elected to said office or position, I will qualify therefor, and that I will support and abide by the principles enunciated by the ____________ Party," after filling in the relevant party's name.

68. Section 3513.07 requires that these declarations "shall be substantially" in the form included in the statute, but says nothing about the candidate's removal from the ballot should an elections board conclude the two declarations were not truthful, or that the candidate otherwise did not act in good faith.

69. Defendant-LaRose, Defendant-Preisse and Defendant-Freedhoff interpreted § 3513.07 to require – notwithstanding the prior claims made by Defendant-Secretary of State in *Jolivette* and this Court's conclusion in *Jolivette* that Ohio law does not impose a subjective "good faith" requirement on candidates who seek to run in political primaries -- that the two political party declarations required by § 3513.07 can be used to disqualify primary candidates that the board members and/or Secretary of State believe are not acting in good faith.

70. Defendant-LaRose's, Defendant-Preisse's and Defendant-Freedhoff's decision to remove Plaintiff-Ronan was not based on objective facts but was based solely on their subjective conclusions that Plaintiff-Ronan's past and present political speech rendered his declared present intent to be associated with the Republican party dishonest.

71. Defendant-LaRose's, Defendant-Preisse's and Defendant-Freedhoff's decision to remove Plaintiff-Ronan was not based on objective facts but was based solely on their subjective conclusions that Plaintiff-Ronan's past and present political speech rendered his declared future intent to, if elected, abide by principles of the Republican party dishonest.

72. Defendant-LaRose's, Defendant-Preisse's and Defendant-Freedhoff's decision to remove Plaintiff-Ronan under § 3513.07 was premised solely upon Plaintiff-Ronan's past and current political positions and past and current political statements.

73. Defendant-LaRose's, Defendant-Preisse's and Defendant-Freedhoff's decision to remove Plaintiff-Ronan was premised solely upon their subjective determination that Plaintiff-Ronan's past political statements and past political positions rendered his present ideology inconsistent with acceptable Republican party principles: As examples:

a. In a letter explaining to their vote to Defendant-LaRose following the hearing, Defendant-Preisse and Defendant-Freedhoff jointly wrote, "<u>Our conclusion that Mr.</u>

Ronan should not remain on the ballot as a Republican is based on his own past, recent, and repeated declarations." *See* Letter, Doc. 26-1, at PageID# 215 (emphasis added).

b. Referring to a 2024 Alabama Public Radio news article about Ronan's 2024 candidacy in the Republican presidential primary against former President Donald Trump, *see* Exhibit C, Defendant-Freedhoff pointed to a number of Ronan's statements that she claimed were incompatible with Republican principles, *see* Transcript, Doc. 26-1, at PageID# 320-23, and stated "I don't see these as being things that the Republican Party would agree on …." *Id*. at PageID# 323.

c. Defendant-LaRose explained in his Letter dated March 19, 2026 to the Franklin County Board of Elections, Letter, Doc. 26-1, at PageID# 362, that his vote against Plaintiff-Ronan was based on

> Mr. Ronan's public statements, and those of individuals associated with him and his candidacy, [which] make clear that Mr. Ronan is seeking the Republican nomination as part of his longstanding strategy to have Democrats run as Republicans in Republican primaries.

74. Defendant-LaRose, Defendant-Preisse and Defendant-Freedhoff imposed an "ideological purity test" on Plaintiff-Ronan's candidacy and removed him from the ballot because they did not consider him to be an acceptable Republican candidate.

75. Defendant-LaRose's, Defendant-Preisse's and Defendant-Freedhoff's current claim that Ohio's statutes mean something completely different from what was represented by Defendant-Secretary of State to this Court in *Jolivette* finds no support in any precedent, case law or historical record.

76. Until now, no board of elections' ruling, judicial decision or authority of any kind has ever stated or suggested that a political primary candidate in Ohio can be removed by elections

officials for lacking political good faith or untruthfully declaring party membership under O.R.C. § 3513.07.

77. No authority of any kind supports allowing the administrative removal of a political primary candidate based on his or her improperly or falsely self-identifying as a party member.

78. Defendant-Preisse, the Republican Chair of the BOE, publicly conceded to the Columbus Dispatch that he believed Ronan would retain ballot access when his case was reviewed by the Ohio Secretary of State. *See* Jordan Laird, *Federal judge keeps former DNC candidate on Republican primary ballot*, COL. DISPATCH, March 20, 2026 (quoting Preisse as saying he "thought the Secretary of State would keep Ronan on the ballot").

79. Defendant-Preisse understood when he voted to disqualify Plaintiff-Ronan that Ohio's ballot access laws did not impose a good faith requirement on political primary candidates.

**JURISDICTION AND VENUE**

80. This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331, because such claims arise under the First and Fourteenth Amendments to the United States Constitution.

81. Venue is proper in this Court because a substantial part of the events giving rise to this action occurred in this district, *see* 28 U.S.C. §1391(b)(2), and because Plaintiffs are residents of the State of Ohio and Defendants are state officials who maintain offices in Columbus, Ohio. *See* 28 U.S.C. § 1391(b)(1).

**COUNT I**

**(Violation of Plaintiffs' Rights Guaranteed by the First and Fourteenth Amendments)**

82. Plaintiffs reassert each preceding allegation in paragraphs 1 to 81 as if set forth fully herein.

83. Defendant-LaRose's, Defendant-Preisse's and Defendant-Freedhoff's decision to remove Plaintiff-Ronan from the ballot based on their subjective determination that he did not or could not truthfully and in good faith declare himself to be a Republican with intent to, if elected, abide by Republican principles violates Plaintiff-Ronan's and Plaintiff-Cordero's free speech, associational and voting rights as guaranteed by the First and Fourteenth Amendments, both facially and as-applied.

**COUNT II**

**(Violation of Article I's Elections Clause)**

84. Plaintiffs reassert each preceding allegation in paragraphs 1 to 81 as if set forth fully herein.

85. Defendant-LaRose's, Defendant-Preisse's and Defendant-Freedhoff's decision to remove Plaintiff-Ronan from the ballot based on a subjective determination that he did not or could not truthfully declare himself to be a Republican with intent to, if elected, abide by Republican principles violates Plaintiffs' rights under the federal Elections Clause in Article I, § 4.

86. Article I's Elections Clause delegates to Ohio's General Assembly, and not to Defendants, the authority to regulate the manner of Ohio's congressional elections.

87. The removal of Plaintiff-Ronan contradicts the statutory scheme put in place by the Ohio General Assembly and accordingly violates Article I's Elections Clause.

88. Defendant-LaRose's, Defendant-Preisse's and Defendant-Freedhoff's decision to remove Plaintiff-Ronan based on Defendants' conclusion that Plaintiff-Ronan subjectively remained a Democrat or member of some other political party rather than a member of the Republican Party further violates the federal Elections Clause in Article I, § 4 by adding substantive qualifications to those spelled out in the federal Constitution.

**Count III**

**(Fourteenth Amendment Due Process Violation**

**By Defendant-Freedhoff and Defendant-Preisse)**

89. Plaintiffs reassert each preceding allegation in paragraphs 1 to 81 as if set forth fully herein.

90. Plaintiff-Ronan's removal from the ballot with the participation of Defendant-Freedhoff and/or Defendant-Preisse violated Plaintiffs' Fourteenth Amendment right to due process of law.

91. Defendant-Freedhoff's and Defendant-Preisse's refusal to disqualify themselves violated Plaintiffs' Fourteenth Amendment rights under the Due Process Clause.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

A. Enter a declaratory judgment holding that the Secretary's and Franklin County Board of Elections' decision to remove Plaintiff-Ronan from the Ohio Republican Party's 2026 primary ballot was unconstitutional on its face and as applied under the federal Elections Clause in Article I, § 4, the First Amendment's Free Speech Clause, and the Fourteenth Amendment's Due Process Clause;

B. Enter a declaratory judgment holding that Defendants' creation of a political good faith requirement for congressional primary candidates, including Plaintiff-Ronan, and their addition of this political good faith requirement to Ohio law, violates the federal Elections Clause in Article I, § 4 and the First Amendment's Free Speech Clause, both facially and as-applied;

C. Enter a permanent injunction prohibiting Defendants from imposing a political good faith requirement on congressional primary candidates, including Plaintiff-Ronan, in the future;

D. Enter a declaratory judgment holding that Defendant-Freedhoff and Defendant-Preisse violated the Due Process Clause by participating in Plaintiff-Ronan's protest hearing;

E. Enter a permanent injunction barring members of the Franklin County Board of Elections from participating in protest actions against candidates when those members have made personal campaign contributions to those candidates or their competitors, or when those Board of Elections members are high-ranking office-holders in organizations that have made campaign contributions to protested candidates or their competitors or received financial payments from same, or when the members or organizations in which they hold high-ranking office otherwise have an interest that would require the recusal of a judge under similar circumstances.

F. Award other and further relief as the Court deems proper; and

G. Award costs and attorney's fees to Plaintiffs under 42 U.S.C. §1988.

**VERIFICATION of PLAINTIFF-SAMUEL RONAN**
**(Pursuant to 28 U.S.C. § 1746(2))**

I, Samuel Ronan, verify under penalty of perjury that the foregoing is true and correct.

Executed on August 28, 2026.

______________________________
Samuel Ronan

**VERIFICATION of PLAINTIFF-ANA CORDERO**
**(Pursuant to 28 U.S.C. § 1746(2))**

I, Ana Cordero, verify under penalty of perjury that the foregoing is true and correct.

Executed on August 28, 2026.

______________________________
Ana Cordero

Respectfully submitted,

*/s/Mark R. Brown*

Mark R. Brown
303 E. Broad Street
Columbus, Ohio 43215
614-236-6590
MBrown@law.capital.edu

/s/*Oliver B. Hall*

Oliver Hall*
(*Pro Hac Vice*)
CENTER FOR COMPETITIVE DEMOCRACY
P.O. Box 21090
Washington, DC 20009
202-248-9294
oliverhall@competitivedemocracy.org

*Counsel for Plaintiffs*

**Ronan v. LaRose, et. al**

# Exhibit A

February 20, 2026

**Via Electronic Mail and Hand Delivery**

Franklin County Board of Elections
22 North Fourth Street
Columbus, Ohio 43215

Re: **Protest of Candidacy of Samuel Peter Ronan as a Republican Candidate for office of Representative to Congress from the 15th District**

Dear Members of the Franklin County Board of Elections:

Pursuant to § 3513.05 of the Ohio Revised Code, Marc A. Schare, a member of the Republican party and qualified elector in the state of Ohio, hereby protests the candidacy of Samuel Ronan as a Republican candidate for the office of Representative to Congress from the 15th District.

The basis for this protest is straightforward: although Ronan filed a Declaration of Candidacy for the Republican primary, clear and convincing evidence confirms ***he is not in fact a Republican***.

To the contrary, as explained in greater detail below, Ronan has a long history of publicly denouncing the Republican party, its elected leaders, and its fundamental principles. He has consistently and unequivocally associated with and advocated for progressive positions and policies of other parties, most prominently the Democratic party. Indeed, he has previously (and recently) campaigned as a Democrat, including for the role as *chairman of the Democratic National Committee.*

In short, Ronan's past *and current* statements and actions unmistakably demonstrate that Ronan is not and does not want to be a Republican. Instead, he is simply pretending to be a Republican as a tool to "get a foot in the door." January 2026 Facebook Post, Exhibit A. ; 2018 Rebel HQ interview, "DNC Chair Candidate Sam Ronan Running As A REPUBLICAN?!," *available at* https://www.facebook.com/watch/?v=2025554687692236&rdid=HyQ3hAcwTOivj0xF.

This is precisely the type of "opportunistic" maneuvering the primary rules are designed to prevent. *State ex rel. Bible v. Bd. of Elections of Hamilton Cnty.,* 22 Ohio St. 2d 57, 60 (1970).

Because the evidence outlined below supplies clear and convincing evidence that Samuel Ronan's purported affiliation with the Republican party and declaration to "support and abide by the principles enunciated by the Republican Party" are false, the Board should disqualify Ronan from appearing on the ballot in the May 5, 2026 Republican primary election.

**A. Ronan's political history and prior campaigns reveal a strong and consistent affiliation with the Democratic and other left-wing/progressive parties.**

Ronan's political career spans nearly a decade and demonstrates strong, consistent ties to the Democratic party and other liberal organizations. Ronan's political career formally began in 2016 when he ran as a Democrat in the Democratic primary for the Ohio House of Representatives District 62 seat. Ballotpedia profile, Ex. B, *available at* https://ballotpedia.org/Samuel_Ronan. Although he won the Democratic nomination, he lost in the general election. *Id.* The next year, he sought to *lead* the Democratic party, running as a candidate for chair of the Democratic National Committee, which he lost. *Id.*

Ballotpedia reports that Ronan has also been associated with the PDPR [People for Democratic Party Reform], the Green Party, the Sunrise Movement, a progressive group focused on climate change issues, and the Socialists of America. *Id.*

**B. Ronan has explicitly and repeatedly proclaimed that Democrats should run for office as Republicans to get elected in conservative districts and admits to doing so here.**

Unable to get elected in the progressive parties with which he actually aligns, Ronan tried a different strategy. In 2018, he ran in the Republican primary for U.S. House Ohio District 1 against incumbent Steve Chabot. In a video interview featured on an online interview series entitled "Rebel Headquarters," Ronan freely admitted that the party flip stemmed not from any genuine change in political ideology, but from a new experimental strategy for trying to defeat Republican incumbents and get progressive candidates elected:

> Q. There is something unique about your candidacy, you are running as the only Republican, I believe that we have profiled here . . . You are running to replace Steve Chabot as a Republican, but you are a Progressive?
>
> A. Yes sir. . . . I put my money where my mouth is. Last year I ran for the DNC Chair and I said if I were the Chair, we would still have to run Democrats as Republicans because that's the only way you're going to make it through. And here I am, I guess, putting the rubber to the road.
>
> Q. Well, it's going to be an amazing test case.

2018 Rebel HQ interview, "DNC Chair Candidate Sam Ronan Running As A REPUBLICAN?!," *available at:* https://www.facebook.com/watch/?v=2025554687692236&rdid=HyQ3hAcwTOivj0xF.

Ronan further explained that the Democratic leadership was not supportive of his candidacy and the Democratic candidate field was crowded, so going to "the GOP side" to "challenge the incumbent directly" would be a more effective strategy in his view. *Id.*

Perhaps most telling, Ronan explained that calling himself a Republican was "the trick" to try to get people to listen to him. *Id.*

Although this interview took place in 2018, Ronan recently reaffirmed his continued support for this strategy. Just weeks ago, *after he submitted his declaration of candidacy as a Republican*, Ronan openly acknowledged that he is simply following the strategy he has been advocating for years:

> "I believe I very clearly mentioned in that very same DNC Chair race that Democrats, if they wanted to govern and regain the trust of American, would have to primary Republicans in deep red districts, as Republicans, just to get a foot in the door. So if I'm doing anything, it's following the argument I made on that stage."

Sam Ronan post on Grove City Area Progress Facebook page:
https://www.facebook.com/groups/1052994605934831, Screenshot Exhibit A.

Although Ohio law allows candidates to change parties, it prohibits them from "altering their political party affiliations for opportunistic reasons" as Ronan admittedly seeks to do here. *See, e.g.*, *State ex rel. Guest v. Husted*, 2018-Ohio-3161, ¶ 15; *Jolivette v. Husted*, 694 F.3d 760, 770 (6th Cir. 2012).

**C. According to his own statements, Ronan aligns with Democratic leaders and positions and does not support the positions of the Republican Party.**

Ronan's political history and unapologetic gamesmanship amply demonstrate Ronan's claimed affiliation with the Republican party is a sham, and his candidacy as a Republican should not be allowed. His public statements and policy statements only further cement the point.

The Internet is replete with videos, social media posts, and position statements in which Ronan openly and explicitly discusses his views on politics and government. His platform is clear, and as one social media commenter aptly put it, "[l]iterally nothing on [his] platform resembles anything on the Republican platform." Comment of Matt Jividen, February 16, 2026 in response to Sam Ronan post on Grove City Area Progress Facebook page. Ex. C.

To the contrary, his political positions, which, unlike his political affiliation, have stayed constant over the course of his political career, include the following:

- **Providing Universal Healthcare** (Samronan.com, https://www.samronan.com/more-issues/universal-healthcare
- **Abolishing ICE and using their funding for public services** (*See Ballotpedia 2026, Ex. B, Candidate Survey* (*"My goal is to abolish ICE, and BPD, reallocate their funds to public services, and prosecute all members of those agencies for their many crimes*.), *available at https://ballotpedia.org/Samuel_Ronan*)
- **Federalizing the police, ending all state and local funding for police forces** (https://www.samronan.com/police-reforms).

- **Federalization of all transportation services, banking, the Internet,** (https://www.samronan.com/taxation-economics).
- **"Immediate erasure of Medical and Student Loan debt, universally across the country."** *Id.*

These policies and positions unequivocally align with the far-left views of the most liberal factions in American politics. It is perhaps no surprise then that Ronan also publicly aligns himself with liberal leaders like Bernie Sanders.

**D. Disqualifying Ronan from appearing on a Republican ballot when clear and convincing evidence shows his declaration of intent to support Republican positions is false serves important state interests.**

The abundant evidence of Ronan's current and past political involvement, public statements, and alignment with Democratic leaders clearly and convincingly demonstrate that Ronan is not a Republican and does not support Republican positions. *Cf. Jolivette*, 694 F.3d at 769; *Guest* 2018-Ohio-3161, ¶ 15.

Ronan's statements to the contrary in his Declaration of Candidacy are false. Accordingly, this Board should disqualify Ronan from appearing on the Republican ballot.

Limiting party primary ballots to those candidates who are genuine members of that party serves the state's legitimate interests in "avoiding overcrowded ballots" and "protect[ing] the integrity of its political processes from frivolous or fraudulent candidacies." *Jolivette*, 694 F.3d at 769 *quoting* Bullock *v. Carter,* 405 U.S. 134, 145 (1972). Moreover, "the state has an interest in regulating ballot access in order to avoid confusion, deception, and even frustration of the democratic process at the general election. *Id.* (internal quotation marks and citations omitted).

Permitting Samuel Ronan to appear on the Republican ballot at the May 5, 2026 primary would undermine these important objectives and undermine the integrity of Ohio's primary system.

**E. Conclusion**

In short, Ohio law does not and should not allow a candidate to intentionally "trick" voters about their party affiliation. That is precisely what Ronan openly admits to doing here. If Ronan is permitted to appear on the Republican ballot against the backdrop of this body of evidence, the mandatory declaration to "support and abide by the principles" of the Republican Party is meaningless.

Accordingly, Republican voter Marc A. Schare respectfully asks the Board to disqualify Ronan from appearing on the ballot.

Please direct all future correspondence to my counsel.

Respectfully submitted,

Marc A. Schare
*Protestor*

Brodi J. Conover, bconover@bricker.com
Rachael N. Guastella, rguastella@bricker.com
Ryan L. Richardson, rrichardson@bricker.com

BRICKER GRAYDON WYATT, LLP

2 East Mulberry Street
Lebanon, OH 45036

100 South Third Street
Columbus, Ohio 43215

*Counsel for Protestor*

**Ronan v. LaRose, et. al**

# Exhibit B

March 13, 2026

**Via Electronic Mail**

Franklin County Board of Elections
22 North Fourth Street
Columbus, Ohio 43215

Re: **Protest of Candidacy of Samuel Peter Ronan as a Republican Candidate for office of Representative to Congress from the 15th District**

Dear Members of the Franklin County Board of Elections:

On behalf of our client Marc A. Schare, a member of the Republican party and qualified elector in the state of Ohio, we submit this post-hearing letter in support of Mr. Schare's protest of the candidacy of Samuel Ronan as a Republican candidate for the office of Representative to Congress from the 15th District.

This protest asks whether a candidate who has openly, consistently, and recently admitted that he is not a Republican can lawfully pretend to be a Republican and appear on a Republican ballot at a primary election. Unless Ohio law allows a candidate to lie on the declaration of candidacy, the answer is and must be no, as two members of this Board correctly held.

As explained in Mr. Schare's written protest, which we incorporate here by reference and attach as Appendix A, Ronan has a long history of publicly denouncing the Republican party, its elected leaders, and its fundamental principles and has previously campaigned as a Democrat, including for the role as *chairman of the Democratic National Committee.*

To be sure, as counsel for Mr. Ronan stresses, a candidate can lawfully change parties. R.C. 3513.191. That's beside the point. Critically, the clear and convincing evidence cited in the protest and presented during the March 6, 2026 hearing confirms that didn't happen here. Instead, as the evidence makes clear, Mr. Ronan's sudden shift is not driven by a sincere change in politics, but rather by a transparent and unapologetic strategy to sabotage the party from within.

Mr. Ronan's social media posts and interview statements demonstrate that Mr. Ronan considers pretending to be a Republican and running in a Republican primary as a tool to "get a foot in the door" for progressive candidates like himself and an opportunity to double the chances of ousting a Republican incumbent.

In 2018, he ran in the Republican primary for U.S. House Ohio District 1 against incumbent Steve Chabot. In a video interview featured on an online interview series entitled "Rebel Headquarters," Ronan freely admitted that the party flip stemmed not from any genuine change in political

ideology, but from a new experimental strategy for trying to defeat Republican incumbents and get progressive candidates elected:

> Q. There is something unique about your candidacy, you are running as the only Republican, I believe that we have profiled here . . . You are running to replace Steve Chabot as a Republican, but you are a Progressive?
>
> A. Yes sir. . . . I put my money where my mouth is. Last year I ran for the DNC Chair and I said if I were the Chair, we would still have to run Democrats as Republicans because that's the only way you're going to make it through. And here I am, I guess, putting the rubber to the road.
>
> Q. Well, it's going to be an amazing test case.

2018 Rebel HQ interview, "DNC Chair Candidate Sam Ronan Running As A REPUBLICAN?!," *available at:* https://www.facebook.com/watch/?v=2025554687692236&rdid=HyQ3hAcwTOivj0xF.

Ronan further explained that the Democratic leadership was not supportive of his candidacy and the Democratic candidate field was crowded, so going to "the GOP side" to "challenge the incumbent directly" would be a more effective strategy in his view. *Id*.

Perhaps most telling, Ronan explained that calling himself a Republican was "the trick" to try to get people to listen to him. *Id*.

Although this interview took place in 2018, Ronan recently reaffirmed his continued support for this strategy. Just weeks ago, *after he submitted his declaration of candidacy as a Republican*, Ronan openly acknowledged that he is simply following the strategy he has been advocating for years:

> "I believe I very clearly mentioned in that very same DNC Chair race that Democrats, if they wanted to govern and regain the trust of American, would have to primary Republicans in deep red districts, as Republicans, just to get a foot in the door. So if I'm doing anything, it's following the argument I made on that stage."

Sam Ronan post on Grove City Area Progress Facebook page: https://www.facebook.com/groups/1052994605934831, Screenshot Exhibit A.

Importantly, Ronan does not deny or dispute that he made these statements. To the contrary, at the March 6, 2026 hearing he openly acknowledged these statements were his.

Ronan further admitted that both he and his campaign are affiliated with a person who posts online as "Ana Aleida-March." She posted about Ronan's campaign just weeks ago. In response, a follower commented "I've always wondered if it might be easier to torpedo the republican party from within as opposed to trying to take on the dems." *See* Testimony of Sam

Ronan and corresponding Exhibits admitted at the March 6, 2026 hearing. To which Ronan's personal confidant and campaign advisor said: "yup! And we're testing out theory lol." *Id*.

Again, when asked about this post, Ronan made no attempt to disavow the strategy.

To the contrary, the crux of his argument, as further evidenced through the filings of his counsel, is not that Sam Ronan's campaign isn't a sham, but that it shouldn't matter under Ohio law.

Ronan's counsel insists that there is no "good faith" requirement to show party affiliation for purposes of declaring candidacy. He misreads snippets from Ohio cases to argue that Ohio law *allows a bad faith affiliation*. But the case law does not support this illogical leap.

Although Ohio law allows candidates to change parties, it prohibits them from "altering their political party affiliations for opportunistic reasons" as Ronan admittedly seeks to do here. *See, e.g.*, *State ex rel. Guest v. Husted*, 2018-Ohio-3161, ¶ 15; *Jolivette v. Husted*, 694 F.3d 760, 770 (6th Cir. 2012). While these cases specifically addressed these issues in the context of disaffiliation from a political party, nothing in their language or reasoning suggests this maxim is limited to situations in which a party seeks to disaffiliate, rather than affiliate.

Indeed, to hold otherwise would essentially equate to a conclusion that Ohio law allows a candidate for office to commit fraud. It does not.

In *Morrison v. Colley*, 467 F.3d 503, 511 (6th Cir. 2006), the Sixth Circuit explicitly stated that "A person of ordinary intelligence . . . is put on notice that 'claims' of *party affiliation* or non-affiliation must be made in good faith; otherwise the person is subject to criminal prosecution." (emphasis added)

While it may be true that Ohio law does not require a candidate to affirmatively demonstrate that his affiliation is in good faith as a precondition to running for a partisan office, that does not mean that where, as here, the Board is presented with clear and convincing evidence that the affiliation is in *bad faith*, the Board should or even can turn a blind eye to that fact.

The bottom line here is that there is clear and convincing evidence that Samuel Ronan's purported affiliation with the Republican party and declaration to "support and abide by the principles enunciated by the Republican Party" are false, the Board should disqualify Ronan from appearing on the ballot in the May 5, 2026 Republican primary election.

A few final points bear mention. Mr. Ronan's counsel continues to insist that Board member Ms. Meredith Freedhoff should have been disqualified from participating in the protest hearing and decision even after the Board unanimously denied his motion to disqualify. Because there was no tie on that issue, it is finally resolved and therefore not before the Secretary of State. It is important to note, however, that the Board's decision was fully supported by Ohio law. Ronan has shown nothing other than that Ms. Freedhoff is an active member of the Franklin County Republican Party and as such has supported Republican candidates and interacted with the party and its members. Mr. Ronan's emphasis on this connection ignores the legal and factual reality that *all*

members of the Boards of election are statutorily required to be affiliated with either the Democratic or Republican party. If that association somehow made the members unqualified to participate in Board decisions, it would defeat the entire purpose of the statute to ensure that the inherently political decisions a Board must resolve are adjudicated by a politically balanced and representative Board.

Mr. Ronan's unfounded focus on who is or is not paying invoices associated with Mr. Schare's protest is equally irrelevant to the issues that were before the Board and are now in front of the Secretary of State. Mr. Brown cites no authority to suggest that there is anything improper about the unsurprising fact that the Ohio Republican party would have an interest in ensuring that political candidates running for office as Republicans are in fact Republicans. As already mentioned, Mr. Ronan has made clear that his entire campaign is a strategy designed to undermine the party. The party has an undeniable interest in ensuring the Board has an opportunity to evaluate that information and make an informed decision.

As this Board already unanimously concluded, such information is irrelevant to the validity of Mr. Schare's protest or Mr. Ronan's eligibility to appear on a Republican ballot. Counsel's voluntary release of that information less than one business day following that hearing as a courtesy to Mr. Ronan's counsel is no way alters or affects the issues before the Board. Put simply, it is a red herring that can only be intended to distract the Board and the Secretary from the real issues before it.

In short, Ohio law does not and should not allow a candidate to intentionally lie about their party affiliation. That is precisely what Ronan openly admits to doing here. If Ronan is permitted to appear on the Republican ballot against the backdrop of this body of evidence, the mandatory declaration to "support and abide by the principles" of the Republican Party is meaningless.

Accordingly, Republican voter Marc A. Schare respectfully urges the Secretary of State to break the tie vote in favor of those Board members who voted to disqualify Mr. Ronan from appearing on the Republican ballot.

Respectfully submitted,

Brodi J. Conover, bconover@bricker.com
Rachael N. Guastella, rguastella@bricker.com
Ryan L. Richardson, rrichardson@bricker.com

BRICKER GRAYDON WYATT, LLP

2 East Mulberry Street
Lebanon, OH 45036

100 South Third Street

Columbus, Ohio 43215

*Counsel for Protestor*

**Ronan v. LaRose, et. al**

# Exhibit C

Alabama Public Radio

Donate/Portal

Want to support APR? Become a monthly contributing listener today!

# GOP Presidential candidate Samuel Ronan gives one-on-one interview with APR

**Alabama Public Radio**

Published January 9, 2024 at 4:00 AM CST




*SamRonan.Com*

A new candidate for the Republican presidential ballot has emerged. Samuel Ronan is the latest person to declare his 2024 bid for the White House.

Prior to this presidential run, Ronan ran for Ohio Senate in 2022, Ohio's 1st Congressional District in 2018 and Democratic National Committee Chair in 2017. He said the reason he declared he was running so late in the Presidential race is because the current options for President are not ideal.

"What we have is a bunch of people running for office, whether it's on the left or the right, who are effectively offering the American people," he said. "Nothing new.

Stanford: Symphonies 1-7 / Handley...
**Symphony no 3 in F minor, ...**

same listen to your masters, follow, obey, etc.," Ronan continued. "The reason why I'm running for office this late in the game as a regular person, is to prove that it can be done. There are better ways, better opportunities, for our country to thrive, and for all of us Americans, just regular folks like you or me, to actually participate in the process."

Ronan said he chose to run on the GOP ballot for this election because his policies and values align more with that party.

"I believe my values are actually better received in the Republican Party. So, I am choosing to run as a Republican. Now, taking it a step further, I'm choosing to run as a Republican because the current cadre of candidates do not represent the needs and the ideals of the American people," he said. "In fact, the frontrunner [Donald] Trump is offering despotism dictatorship and worse, whereas the four other candidates are offering watered down versions of some or all of his policies."

Another reason Ronan said he chose to run on the Republican ballot is because the party is open to hearing new ideas from their candidates.

"The Republican Party, for all of the faults or all of its good, is open to varying ideas," he explained. "They do not prevent people from running. They do not close their primaries, and they do not deny the winner their victory so they can have their preferred candidate in place. My values match the Republican Party of yesterday. I feel that I represent the history of the Republican Party, the true value of where the Republican Party thrived back during the [Dwight D.] Eisenhower years," Ronan said.

One of Ronan's main policies is the America Works Program. Through this program, Americans would have access to a job board and national training centers for major industries in the nation. Ronan said these training centers would help usher younger people into America's aging workforce.

"If we can train our soldiers straight out of high school how to fix multimillion dollar aircrafts and multibillion dollar ships, surely we can train our citizens how to get involved in rail, in infrastructure in fiber optics, in helping farmers," Ronan said. "There are many jobs out there, not all of them labor intensive, that are in desperate need of

Stanford: Symphonies 1-7 / Handley...
**Symphony no 3 in F minor, ...**

trades and saying that they aren't as worthy as the bachelor's degrees and the master's and doctorate degrees."

The America Works Program is not just limited to American citizens. Ronan said he wants to allot a percentage of this program to immigrants who are working in America as well.

"We do have a border crisis. It's a humanitarian one. Our foreign policy has disrupted so many Latin American, Central American and South American nations, that they are fleeing their homes; traveling months, weeks, days across treacherous territory to make it to America for the simple hope that maybe they can survive and take care of their loved ones," Ronan said. "Of course, we can't just open our borders. Not everyone has good intentions, but what we can do is treat it as a humanitarian crisis rather than a criminal one," Ronan continued. "We can streamline the process: if you work in America and apply to the America Works program and agree to go to wherever America needs you with the skills that you provide and that you showcase, you can earn your path to citizenship, much like enlisting in the military."

Another policy Ronan feels strongly about is his tax policy. He said he plans on eliminating taxes for people who make under $100,000 a year, canceling all student and medical debt and taxing billionaires 99%.

"My goal is to eliminate any and all income taxes. All of them to include Social Security, to unfold Medicare and put paying for those things, on the wealthy on those who have 90% [and] control of all wealth in America," he said. "In so doing, we will dramatically improve the spending power of the average citizen. We will raise tens of thousands of millions of Americans out of poverty. We will be able to address the rising cost of living directly. We will be able to fully fund all of our federal and state projects and works directly by making those with the resources pay for it," Ronan continued.

He said his policy for taxing billionaires 99% comes from Former President Dwight D. Eisenhower's tax policy.

"In my tax vision, billionaires will not exist. If you make a billion dollars, either as an

Stanford: Symphonies 1-7 / Handley...
**Symphony no 3 in F minor, ...**

Eisenhower, a Republican president and war hero from World War II, when he himself implemented a 94% upper percent tax rate for the $400,000 and above bracket," Ronan continued. "Meaning if you made at least $400,000 as an individual or a business, you paid 94% in taxes."

Ronan said he also plans to reform the police once he becomes President. He said police brutality in America has been a problem for many years. However, in recent years, it has escalated significantly.

"It's because policing is an institution, and our country is directly derived from the slave patrol. Our country has had such a long and insidious history of slavery and cruelty against people of other that we have always had some sort of agency in place to prevent them, the other, from prospering," Ronan said.

He said the police budget in every state can range anywhere from 30% to 60% of the state's entire budget. However, despite the high amount of money, Ronan said the police and other law enforcements do not protect citizens. He said defunding the police by half is necessary to have a more functional police system in America.

"When I talk about police reform, I'm talking about that history and our current reality, needing to be fundamentally changed. First, we defund the police. As it is, that 50% should be put toward different social programs. That'll adjust crime and drug addiction, poverty, homelessness," Ronan said. "Police shouldn't be responsible for all of that anyway, even if they weren't a corrupt institution. It's entirely too many hats to wear for one institution. There's no way you could effectively train one person to handle a psychotic break, a medical emergency, homelessness, poverty," he continued. "There's no way to address all of that in one. So, first, we take those funds and redistribute it into other programs. We then address the real issues in our communities and in our state."

Ronan said along with defunding the police, he would also enforce federal standards to ensure law enforcement is protecting citizens.

"Enforcement of federal standards and enforcement of duties is how we reform our policing in America," he explained. "But it will require some significant changes to the

Stanford: Symphonies 1-7 / Handley...
**Symphony no 3 in F minor, ...**

continued. “Those that do not comply, the officers who resist and refuse to change and be better, will be arrested. They will suffer the consequences of their actions. Because accountability is the primary missing element in our government in our society.”

Ronan said his police reform policy is also related to America’s apparent border crisis.

“The border crisis is simply a continuation of all these atrocities in leading into today and the actions that have been committed by the American federal government and the administration's directive them,” he said. “These are human beings like you and me, who lived lives like you and me, who had jobs like you and me. Hopes, dreams and aspirations like you and me and had been torn from them because of the actions of American foreign policy,” Ronan said.

Ronan said treating the border as a humanitarian crisis would allow Americans to have more empathy for immigrants.

“I think treating [the border] as a humanitarian crisis is not only the ethical and moral thing to do, but it serves all of our interests,” he explained. “As Americans, as immigrants wanting to come to America and embracing the American dream, we are a nation of immigrants. We are the melting pot nation of the world. We are the social experiment. So, why would we stop that now? We should be embracing this opportunity to bring these people into our country. To help build it and rebuild it and reform it in an image that we can all participate in,” he continued.

Ronan said people should vote for him because he understands the problems of today’s America better than the other candidates do. He said the other candidates do not understand the plight of the American people because they have not had to live the experiences of the average American citizen.

“Why take a chance and Samuel Ronan to become the next president of the United States? Look around you. Look at the candidates that are running: Joe Biden, Donald Trump, Nikki Haley, DeSantis, Rebecca, Vivek Ramaswamy, Governor Christie, even RFK Jr,” he said. “Why would you trust them to have your best interests in mind when

Stanford: Symphonies 1-7 / Handley...
**Symphony no 3 in F minor, ...**

go through. They only see the social issues these domestic problems these foreign policies as polling numbers," Ronan continued. "They don't care, nor do they understand the absolute suffering and pain that Millennials and Gen Z go through with all these steps and these lots of opportunity to get into the workforce to engage in their government."

Ronan also gave his predictions for the Republican candidates and how the 2024 election will go.

"Vivek will be the first to drop out. DeSantis will be the second to drop out, and what we will see is that Nikki Haley will either close the gap between Donald Trump or she will end up becoming his running mate," he said. "I do not believe Governor Christie will end up being the nominee for the simple fact that he doesn't offer much different to the American people. His policies and views are Bush Jr., Bush Sr.-esque, and the American people are not interested in that. What they want is some sort of populism, and right now, the only person delivering that is Trump."

Ronan said if America's political climate remains the same, there is a chance that the nation will see a second Donald Trump presidency.

"It's not that he's popular because he's a good leader, or a viable candidate, if he's popular, because the other guy, the other person, is so detestable, so unliked and unpopular, that Trump seems like the lesser of two evils," Ronan said. "Now, on top of that, he keeps getting free media presence by being brazen. If the media treated his brazen behavior with the immaturity that it deserves, then he would not have nearly as much airtime as much presence in people's lives to be seen as viable," he continued. "The fact that he did try or allegedly tried to facilitate an insurrection on January 6, that he has so many charges and criminal indictments against him currently, this should be disqualifying outright, and yet, it isn't."

Ronan said he thinks that Governor Ron DeSantis' current policies in Florida, from a strict abortion law to "Don't Say Gay" to book banning to less restrictive gun legislation, would not hold up on a national level if DeSantis became President of the United States.

Stanford: Symphonies 1-7 / Handley...
**Symphony no 3 in F minor, ...**

explained. "No leader in history who burned or banned books has ever been on the right side of history, and Americans are aware of that. So, that wouldn't work," he explained. "Strict immigration policy is flying in the face of our nation's history and our core ethos in the first place. When you have so many immigrants in America regardless, that's just not going to work. And with the Don't Say Gay [law], gay people, transgender people, and everything in between, have existed for as long as humans have existed."

Ronan also said he does not believe that current President Joe Biden will remain in office for another four years.

"There is no national or international event that could galvanize him into remaining in the White House," he said "There is there is not a future in the entire multiverse where Joe Biden wins a second term, and it is because of his lack of agency. It is because of his will lack of inspiration It is because of his blatant corruption in violation of international law by aiding and abetting Israel's genocide and ethnic cleansing of Palestinians," he continued. "And never mind, the scandal with his son. Never mind his failure to fulfill his promises during the campaign of debt forgiveness. He has done nothing to fundamentally improve the lives of American citizens, and people are not going to be forgiving."

Ronan said he believes that Biden should retire from politics entirely.

"[Biden] is probably on his way to a nursing home, and I don't even say that derogatorily. We are seeing the early signs of dementia with the man, and I feel like it's elder abuse at this point to allow him to run into stay in office," Ronan explained. "It's only going to detrimentally impact our own national stability and standing in the world if we can't even trust the agency of our own president."

Ronan also said that while he does not know who Trump's Vice President will be if he wins the election, Nikki Haley would be the best.

"For all of his bluster, and for all of his poor views, and how horrifically his administration went… populism is covering the domestic issues platform solidly and that's what people like about him. He says the things that they want to hear, and then

Stanford: Symphonies 1-7 / Handley…
**Symphony no 3 in F minor, …**

Nikki Haley, being an ambassador and having been in the United Nations and having actually engaged with all of these foreign leaders, would be the stability."

Ronan said overall, if American politics remain the same, there will be another Trump administration which is concerning due to the age of the former president.

To learn more about Ronan's policies, visit his website here.

**Tags** News election White House Alabama GOP Primary Alabama Republican Party

**News from Alabama Public Radio** is a public service in association with the University of Alabama. We depend on your help to keep our programming on the air and online. **Please consider supporting the news you rely on** with a *donation today*. Every contribution, no matter the size, propels our vital coverage. *Thank you.*

Donate

Stanford: Symphonies 1-7 / Handley...

**Symphony no 3 in F minor, ...**

Stay Connected

Digital Media Center
Bryant-Denny Stadium, Gate 61
Box 870370
920 Paul Bryant Drive
Tuscaloosa, AL 35487-0370
205-348-6644

© 2026 Alabama Public Radio

Resources >

About APR
Contact Us
Careers
APR Mobile App >

Apple devices
Android devices

Stanford: Symphonies 1-7 / Handley...
**Symphony no 3 in F minor, ...**

**Ronan v. LaRose, et. al**

# Exhibit D

303 East Broad Street
Columbus, Ohio 43215

614-236-6590
mbrown@law.capital.edu

February 27, 2026

Franklin County Board of Elections
c/o Jeffrey Mackey
1700 Morse Rd
Columbus, OH 43229

Delivered via email to jomackey@vote.franklincountyohio.gov

In re Protest of Samuel Ronan

Dear Board of Elections,

I represent Samuel Ronan, a candidate for the 15th Congressional District Republican primary in Ohio. Mr. Ronan's candidacy has ostensibly been protested by Marc A. Schare, who claims to be a member of the Ohio Republican Party and eligible to vote in Mr. Ronan's election. A hearing has been scheduled for March 4, 2026, 3 pm at your Morse Road office.

The Board should have received Mr. Ronan's motion to dismiss that protest. Before the Board addresses that motion, and before it reaches the substance of Mr. Schare's protest, Mr. Ronan respectfully moves to disqualify Meredith Freedhoff from participating in the proceedings.

Meredith Freedhoff, presently a member of the Franklin County Board of Elections, chairs the Franklin County Republican Party (FCRP). *See* Franklin County Republican Party, https://franklincountygop.org/history-fcgop ("Meredith Freedhoff serve[s] as chair"). FCRP on August 26, 2025 contributed $500 to the 2026 congressional campaign of Mike Carey. *See* Federal Election Commission, Schedule B, Franklin County Republican Party, https://docquery.fec.gov/cgi-bin/forms/C00913681/1919146/sb/ALL. Mike Carey is Samuel Ronan's sole opponent in the 2026 15th Congressional District Republican primary in Ohio. A ruling against Mr. Ronan by the Board will automatically elevate Mr. Carey (whom the FCRP and Ms. Freedhoff support) to the general election as the Republican Party's candidate.

Ms. Freedhoff's public support for Mr. Ronan's primary opponent's 2026 congressional campaign (i.e., Mr. Carey's campaign) creates a debilitating conflict of interest on her part. Just as she cannot now participate in a hearing addressing the validity of Mr. Carey's candidacy and petition papers, she cannot ethically participate in a hearing addressing the validity of the candidacy and petition papers of Mr. Carey's sole opponent, Samuel Ronan. Ms. Freedhoff's role as chair of the FCRP, which has taken sides in this contest by contributing to and supporting Mr.

Carey's 2026 congressional campaign, renders her unable to project the appearance of objective impartiality that Ohio's elections require. Ms. Freedhoff is disqualified as a matter of law from participating in Mr. Ronan's hearing, and Mr. Ronan respectfully moves the Board to disqualify her.

Boards of Elections are governed by Ohio's ethics laws "enumerated in Ohio Revised Code Chapters 102 and 2921 as well as in the Ohio Ethics Commission's advisory opinions and in case law." Ohio Secretary of State Ethics Policy, https://www.ohiosos.gov/globalassets/elections/eoresources/general/ethicspolicy.pdf, at page 1. "All members and employees of the Ohio boards of elections shall familiarize themselves with Ohio ethics laws and comply with Ohio ethics laws at all times." *Id*. (emphasis added). Compliance is mandatory.

Under Ohio's ethics laws and the Secretary of State's Ethics Policy, "Members and employees of the boards of elections should avoid actions and associations that create an appearance of impropriety, that undermine public confidence in Ohio elections officials, or that interfere with the performance of duties by Ohio elections officials." *Id*. at 3 (emphasis added). Because Ms. Freedhoff chairs FCRP, which has publicly supported Mr. Ronan's opponent in the primary election at issue by donating cash to him campaign, her participation in removing Mr. Ronan would create "an appearance of impropriety" and partiality that "undermine[s] public confidence in Ohio elections officials." She must accordingly be disqualified from participating in all aspects of Mr. Ronan's hearing.

While the "appearance of impropriety" created by FCRP's contribution to Mr. Ronan's opponent alone requires Ms. Freedhoff's disqualification, two additional ethical restrictions on board members' participation in matters affecting "business associates" also disqualify her. Campaign finance records reveal that Mr. Carey's campaign on December 31, 2025 paid to FCRP, which Ms. Freedhoff chairs, $10,807.12. *See* Itemized Disbursements, Committee: Carey Victory Fund, https://docquery.fec.gov/cgi-bin/forms/C00790691/1939947/sb/ALL. Mr. Carey, FCRP and Ms. Freedhoff thus have an established business/economic relationship. Mr. Carey is a "business associate" of FCRP, and thus likewise a business associate of FPRC's chair, Ms. Freedhoff.

As explained by the Secretary of State, "[m]embers and employees of the boards of elections shall not participate in the consideration of any matter involving … business associates or other individuals or entities with whom they have a close association." Ohio Secretary of State's Ethics Policy, *supra*, at 3 (emphasis added). Further, "[m]embers or employees of the board of elections shall not participate in the consideration of any matter in which they have a personal or economic interest." *Id*. This latter restriction includes matters that affect the personal or economic interests of a member's "business associate," too. *Id*.

Under either and both of these "business associate" prohibitions, Ms. Freedhoff must be disqualified from participating in Mr. Ronan's case. Ms. Freedhoff's FCRP has not only donated

money to Mr. Carey's campaign, it has received disbursements from Mr. Carey's campaign totaling over ten thousand dollars. Mr. Carey's campaign can only be described as a "business associate" of FCRP and Ms. Freedhoff. The large payment from Mr. Carey's campaign to FCRP reveals that FCRP and Ms. Freedhoff have an "economic interest" in Mr. Carey's success. And even if Ms. Freedhoff were not herself to have an economic interest, Mr. Carey's campaign will benefit from a decision removing Mr. Ronan from the ballot. Because Mr. Carey is a business associate of FCRP, which Ms. Freedhoff chairs, Ms. Freedhoff cannot participate in any matter that might benefit Mr. Carey's "personal or economic" interest. Removing Mr. Ronan would clearly benefit Mr. Carey's "personal or economic" interest. Ms. Freedhoff is accordingly disqualified.

Even were these "business associate" prohibitions not to technically apply, the financial connections between FCRP (chaired by Ms. Freedhoff) and Mr. Carey's campaign – with donations flowing to Mr. Carey's campaign and disbursements flowing from his campaign to FCRP – cannot be ignored. They reinforce the "appearance of impropriety" that would permeate any involvement Ms. Freedhoff might have in the case. For this reason, Ms. Freedhoff must be disqualified.

For all these reasons, Mr. Ronan respectfully moves to disqualify Ms. Freedhoff from participating in his case.

Respectfully submitted,

Mark R. Brown

Attorney for Samuel Ronan

Cc:

Brodi J. Conover, bconover@bricker.com
Rachael N. Guastella, rguastella@bricker.com
Ryan L. Richardson, rrichardson@bricker.com

BRICKER GRAYDON WYATT, LLP

Counsel for Marc A. Schare

**Ronan v. LaRose, et. al**

# Exhibit E




Welcome to the Franklin County Republican Party Website. We are committed to promoting conservative values, supporting strong candidates, and serving the people of Franklin County.

FRANKLIN COUNTY REPUBLICAN PARTY

# OUR 2026
# ENDORSED CANDIDATES

Governor - Vivek Ramswamy
Attorney General - Keith Faber
Auditor - Frank LaRose
Treasurer - Kristina Roegner
Secretary of State - Robert Sprague

U. S. Senate - Jon Husted
U.S. Congress - Mike Carey

Ohio Supreme Court - Dan Hawkins
Ohio Supreme Court - Colleen O'Donnell


Ohio Senate D15 - Joe Healy
Ohio Senate D25 - Don Roberts
House District 1 - Joel A. Greff
House District 3 - Bernadine Kennedy-Kent
House District 5 - Richard Cole
House District 6 - Matthew Jackson
House District 7 - William Mercier
House District 8 - Kelly Hunter-Kalagidis
House District 9 - Bruce Euans
House District 10 - Denise D'Angelo
House District 11 - Shawn Kaeser
House District 12 - Brian Stewart
State Central Committee Members
SD 03 - Michelle Anderson
SD 03 - Clayton Henson
SD 15 - Ron O'Brien
SD 16 - Meredith Freedhoff
SD 16 - Josh Brown
SD 25 - Susie O'Brien
SD 25 - Jim Burgess
All Incumbent Franklin County Central

**Ronan v. LaRose, et. al**

# Exhibit F

**Post**

**Ohio Secretary of State**
@OHSecofState

Secretary LaRose has decided a tie vote of the Franklin County Board of Elections in favor of a protest against the candidacy of Samuel Ronan, who was seeking the Republican nomination for the office of U.S. Representative in the 15th Congressional District. The board has been informed that Mr. Ronan is no longer a certified candidate for the May 5, 2026 Primary Election, and the board has been instructed to provide proper notice with all ballots that votes for this candidate will not be counted.

3:13 PM · Mar 19, 2026 · **592** Views

1 3 3 2

**New to X?**

Sign up now to get your own personalized timeline!

Sign up with Google

Sign up with Apple

**Create account**

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Something went wrong. Try reloading.

**Retry**

Terms of Service | Privacy Policy | Cookie Policy | Accessibility | Ads info | More ··· © 2026 X Corp.

**Don’t miss what’s happening**

People on X are the first to know.

**Log in** **Sign up**

**Ronan v. LaRose, et al.**

# Exhibit G

Frank LaRose
Ohio Secretary of State

***<u>Via Electronic Mail</u>***

March 19, 2026

Douglas J. Preisse, Chairman
Meredith Freedhoff
Michael E. Sexton
Jamie Schumaker
Franklin County Board of Elections
1700 Morse Road
Columbus, OH 43229

Re: Tie Vote Regarding the Protest of Candidacy of Samual Ronan

Dear Chairman Preisse and Board Members,

I have reviewed the tie vote referred to me by the Franklin County Board of Elections ("the Board") on March 13, 2026, as well as the arguments, authorities, and evidence submitted to my office. I now break the tie vote submitted to my office in favor of the protest against the candidacy of Samuel Ronan for Representative from the 15th Congressional District.

**Background Information**

A protest was timely filed with the Franklin County Board of Elections regarding the candidacy of Samual Ronan as a Republican candidate for the office of Representative to Congress from the 15th District. On March 6, 2026, the Board met and held a hearing on the protest. The protest, which was brought by Marc A. Schare, alleged that Mr. Ronan is not a Republican and therefore should not be on the May 5, 2026, primary ballot as a candidate for Congress.

At the conclusion of the hearing, and following a closed session to deliberate, board member Jamie Shumaker made the following motion:
*After conducting a hearing regarding the protest against the candidacy of Samuel Ronan, a Republican candidate for Representative to Congress in the 15th District, submitted by Marc Schare...I move that the Franklin County Board of Elections determine that the candidate's declaration of candidacy and petition of Samual Ronan are valid and deny the protest based on the evidence presented at this hearing. I find that the protest [sic] failed*

*to meet his burden by clear and convincing evidence to show that Samuel Ronan failed to comply with Chapter 3513 of the Ohio Revised Code.*

The motion was seconded by Member Michael Sexton.

The Board vote resulted in a tie. Members Shumaker and Sexton voted to deny the protest, and Chairman Preisse and Member Freedhoff voted in favor of the protest.

On March 13, 2026, the Board submitted this tie vote to me for consideration in accordance with Ohio Revised Code Section 3501.11(X). On that date, the Board also submitted to my office the position statements, supporting evidence admitted during the hearing, and a copy of the hearing transcript. Additionally, although not consistent with established practice, counsel for the candidate and counsel for the protester each submitted briefs on behalf of their clients.[1]

**Analysis**

After consideration of the arguments and the materials provided, I am breaking the tie in favor of the protest. Mr. Ronan's public statements, and those of individuals associated with him and his candidacy, make clear that Mr. Ronan is seeking the Republican nomination as part of his longstanding strategy to have Democrats run as Republicans in Republican primaries.

As Board Members Preisse and Freedhoff argued in their letter explaining their vote, the issue here is not "ideological purity." Members of political parties are obviously free to disagree internally about a range of issues, and my decision does not suggest otherwise. However, this case presents questions about the integrity of the electoral process. As Members Preisse and Freedhoff point out, Mr. Ronan has "openly and repeatedly" stated that he (and others) should run as Republicans, not because they are Republicans, but so that Democrats can get a foothold in Republican-leaning districts. The goal of his scheme is to get voters to vote for Democrats, believing they are voting for Republicans.

---

[1] A post-hearing analysis by the Protestor's counsel was included in the materials submitted to my office by the Board of Elections, and Mr. Ronan's counsel additionally forwarded his briefs to my office. Mr. Ronan's merit brief included arguments and allegations that Board Member Freedhoff had a conflict of interest and was required to abstain from participating in Mr. Ronan's hearing. I find these arguments without merit. It is worth noting that the two Democratic board members did not mention the alleged conflict of interest in their statements supporting their votes.

Mr. Ronan argues that there is no "good faith" requirement on candidates seeking to affiliate with political parties in order to run for office. I agree that it is not the job of the state or this office to impose ideological litmus tests on a candidate's self-identification. But again, that is not the fact pattern presented here.

On each petition, Mr. Ronan declared that if elected, he would support and abide by the principles enunciated by the Republican Party. He signed this declaration. Yet there is ample evidence demonstrating that his goal is not to support the party's principles, but rather for Democrats to "primary Republicans...just to get a foot in the door." (Exhibit P2). To be clear, candidates can change party affiliation. (*See* R.C. 3513.191). Here, however, Mr. Ronan's statements do not show a change in affiliation but instead highlight his ongoing mission to run Democrats as Republicans to infiltrate the party.

I reject Mr. Ronan's apparent argument that a candidate may affiliate with a political party in bad faith. In another context—specifically, the question of whether a candidate has disaffiliated from a political party in order to become an "independent"—both state and federal courts have required that the candidate's action be undertaken in good faith. *See State ex rel. Coughlin v. Summit Cty. Bd of Elections*, 136 Ohio St.3d 371, 375 (2013) (citing *Morrison v. Colley*, 467 F.3d 503, 509 (6th Cir. 2006)); *Jolivette v. Husted*, 886 F. Supp.2d 820, 823-24, 833 (S.D. Ohio Aug. 15, 2012). Those cases are instructive here.

For the foregoing reasons, I break the tie in favor of the protest and against certifying Mr. Ronan to the May 5, 2026, Republican Primary Election Ballot for the Representative to Congress for the 15th District.

If you have any questions regarding this decision, please contact Lisa Eschbacher, Deputy Chief Legal Counsel for Elections at the Secretary of State's Office, at leschbacher@ohiosos.gov.

Yours in service,

Frank LaRose

Frank LaRose
Ohio Secretary of State

cc: Antone White, Director
David R. Payne, Deputy Director

**Ronan v. LaRose, et al.**

# Exhibit H

C5 SEP -6 PM 4:16
CLERK OF COURTS

**IN THE COURT OF APPEALS OF OHIO**
**TENTH APPELLATE DISTRICT**

| | | |
|---|---|---|
| **STATE OF OHIO *EX REL.*, RICHARD FINAN,** | : | |
| **Relator,** | : | **CASE NO. 05APD-08-0854** |
| vs. | : | |
| **J. KENNETH BLACKWELL, Secretary of State of Ohio,** | : | **ORIGINAL ACTION IN PROHIBITION** |
| **Respondent.** | : | |

---

**BRIEF IN OPPOSITION TO COMPLAINT FOR EMERGENCY PEREMPTORY WRIT OF PROHIBITION OF RESPONDENT J. KENNETH BLACKWELL, SECRETARY OF STATE**

---

Quintin F. Lindsmith, Esq. (0018327)
*Counsel Of Record*
Anne Marie Sferra, Esq. (0030855)
Vladimir P. Belo, Esq. (0071334)
BRICKER & ECKLER, LLP
100 South Third Street
Columbus, OH 43215
Telephone: (614) 227-2300
Facsimile: (614) 227023900
Email: glindsmith@bricker.com
asferra@bricker.com
vbelo@bricker.com

*Attorneys for Relator, Richard Finan.*

**JIM PETRO (0022096)**
**ATTORNEY GENERAL OF OHIO**

Larry H. James (0021773)
Mark E. Kerns (0018326)
Christina L. Corl (0067869)
CRABBE, BROWN & JAMES, LLP
500 S. Front Street, Suite 1200
Columbus, Ohio 43215
Telephone: (614) 228-5511
Facsimile: (614) 229-4559
Email: LJames@CBJLawyers.com
MKerns@CBJLawyers.com
CCorl@CBJLawyers.com

*Attorneys for Respondent, J. Kenneth Blackwell, Secretary of State of Ohio.*

261989

# Ohio House of Representatives

58th House District
Eastern Butler County
Office - 614-466-8550
Toll Free - 1-800-282-0253
Home - 513-422-6199

SCOTT R. NEIN
Assistant Majority Leader

**COMMITTEES:**
Education
Ethics & Elections
Vice Chairman
Public Utilities

TO: MEMBERS OF THE CAMPAIGN FINANCE REFORM TASK FORCE

DATE: JUNE 13, 1995

RE: HOUSE BILL 99

House Bill 99, the election law clean-up bill sponsored at the request of Bob Taft, Secretary of State, amends various portions of Title 35 of the Ohio Revised Code. The changes cover four main areas, amendments which delete outdated or outmoded practices; changes which conform the statutes to Ohio Supreme Court decisions; changes which grant more authority to the Boards of Elections to establish operating procedures; and changes which either address existing gaps in the law or make the laws operate consistently. The following points highlight the changes to Title 35 proposed in HB 99:

<u>**Deletion of outmoded practices**</u>:

1. Deletes the reference to registration precincts.

2. Allows the BOE to man each polling location with as few as four (4) poll workers instead of the current minimum of six (6).

3. Deletes all references to "black lead pencil" and substitutes "marking device".

4. Eliminate the need to post the names of registered voters at each polling location fifteen (15) days in advance of election. Instead list must be available at the BOE during that time.

5. Reduces ballot stub to as little as 1/2".

6. Deletes reference to marking a ballot with an "x".

COPY OF A PUBLIC RECORD IN THE CUSTODY OF THE OHIO HISTORICAL SOCIETY UNDER PROVISIONS OF SECTION 149.31 OF THE OHIO REVISED CODE."

7. Deletes references to "clerk of elections" and "clerk of court poll book" as these are no longer used.

8. Changes the mailing requirement from registered mail to certified mail.

9. Deletes "form 2" from the abstract requirements as it duplicates the information supplied in "form 1", and renumbers all forms. (Both these forms are used to report the official results for elections involving statewide and general assembly candidates.)

<u>**Changes to Conform the Statutes to Ohio Supreme Court Decisions:**</u>

1. Clarifies that precinct changes made after the filing of a local option petition does not affect the "option" boundaries for voting purposes.

2. Provides that Ohio residency is lost, regardless of intent, if you reside outside the state for four (4) continuous years, except if you are absent from the state due to government service.

3. Clarifies that a person meets the residency requirements, for purposes of signing petitions and voting, if he or she resided or will reside in the County at least thirty (30) days by the date of the election at which they vote or for which they signed the petition.

4. Extends Ohio's "sore-loser" provisions to persons who are presidential contenders in a primary election.

5. Allows for withdrawal of candidates at any time and establishes procedures for the Boards of Elections to follow to delete the name of such candidate from the ballot, or if that is not possible to not count the votes cast for the person who has withdrawn.

6. Allows for the committee of five (5) who nominated an independent candidate to replace a withdrawn independent candidate. Does not change the deadline for replacing any withdrawn candidate.

COPY OF A RECORD IN THE CUSTODY OF THE OHIO HISTORICAL SOCIETY UNDER PROVISIONS OF SECTION 149.31 OF THE OHIO REVISED CODE.

<u>**Changes which Grant More Authority to Boards of Elections:**</u>

1. Delete the requirement that the meeting to organize the BOE must commence at 1:00 p.m. with voting to occur every 20 minutes.

2. Allows each BOE to determine what is the best schedule for opening the additional four (4) hours the last three (3) weeks before the close of registration.

3. Clarifies that it is the duty of the BOE to approve the language for local options and issues and to certify the issues and candidates to the ballot. Secretary of State will still review and give final approval.

4. Deletes the requirement that polls be opened for 1/2 hour on the Monday night before each election.

5. Allows for delivery of supplies up to ten (10) days before the election instead of the current which is three (3) days prior.

6. Expressly allows each BOE to produce mailing labels if they so desire, and allows BOE to deny access to petitions, absentee voter applications, and registration cards during the last twenty-one (21) days before the election if the BOE believes that access interferes with the BOE operations.

7. Allows the BOE to set procedures for counting ballots with oversight provided by the Secretary of State.

8. Allows for certain official canvass duties to commence prior to eleven (11) days after the election and automatically allows for the recount of ballots as part of the official canvass.

9. Eliminates need for printing "write-in" line on ballot if no write-in candidate has filed.

<u>**Changes to Address Gaps in the Law:**</u>

1. Secretary of State has the duty to set certain deadlines (i.e. filing of petitions, certification to ballot etc.) for special congressional elections.

2. Clarifies the language on notice re: penalty for double voting. Makes it clear that penalty is a forth degree felony.

3. Designates each Board Of Election as a polling location on election day and during absentee and walk-in voting.

4. Establishes the deadline by which Boards Of Election tie votes must be submitted to the Secretary of State's office for decision (within 14 days of the date of the tie vote).

5. Deletes the phrases "next succeeding" and "last succeeding", and "next preceding" and "last preceding" and substitutes the phrases "succeeding" and "most recent", where applicable.

6. Prevents a Board Of Election from invalidating a candidate's petitions for technical reasons after fifty (50) days before the election.

7. Allows for walk-in voting at Boards Of Elections on the Monday before the election.

8. Extends walk-in voting provisions to persons with disabilities who can't get to Board Of Elections offices on election day and sets procedures for such voting.

9. Requires each person who updates their registration to provide their date of birth as part of the update.

10. Requires the Department of Health to notify the appropriate county BOE of an out-of-state death of an Ohio resident of which the Department get notice.

11. Extends the walk-in voter name change provisions to persons with disabilities who can't get to the Board Of Elections offices on election day and sets procedures for such voting.

12. Each new registrant must declare at the time of registration if he or she is registered in another county.

13. Allows for use of paper ballots in certain circumstances. (e.g. a court orders an issue or candidate to be placed on the ballot, at a time that is too late for printing).

14. Changes the questions asked to challenge a voter to conform with changes to the walk-in voting law changes.

15. Allows for transmission of unofficial results to the Secretary of State by phone, fax, or other telecommunication device.

16. Allows for absentee ballot voting by people engaged as police officers, fire fighters, and emergency medical personnel, people who are late hires as Board Of Elections temps, and people who have a medical emergency at any time before the election (instead of six as is current law).

17. Requires a signature as part of an application for absentee ballot.

18. Allows for faxing of absentee application and for initial sending of ballots by BOE for military and overseas personnel.

19. Establishes procedures for Boards Of Elections that receives faxed absentee ballot applications and faxes out absentee ballots. VOTED BALLOTS CANNOT BE RETURNED BY FAX.

COPY OF PUBLIC RECORD IN THE CUSTODY OF THE OHIO HISTORICAL SOCIETY UNDER PROVISIONS OF SECTION 149.31 OF THE OHIO REVISED CODE.

20. Changes the filing deadline for write-in candidates from forty (40) to fifty (50) days before the election.

21. Sets deadlines and procedures for protests against write-in candidates.

22. Makes changes to petitions to make them easier to understand, and deletes need to have red printing on initiative petitions.

23. Reduces the required number of petition signatures for:

    a. candidates to office of municipal corporations with a population of less than 2,000, from 25 to 10.

    b. municipal officers in statutory cities, from 100 to 50.

    c. candidates for County Board of Education, from 150 to 50.

    d. candidates for State Board of Education, from the lesser of 500 or 1% of those voting for governor in the last such election, to 100.

24. Clarifies that Park District ballot issues can be placed on the ballot in May of odd numbered years even though there may be no candidates on the ballot.

25. Fixes the time deadline by which the initiative petitions must be filed in issue elections at 4:00 p.m.

26. Allows a person to run for election in a party primary regardless of their party affiliation.

27. Clarifies that the central committee of a county political can, by rule, allow the executive committee of the same party who reside within the appropriate district to replace on the ballot a candidate for district office.

28. Allows public employees who are in the classified civil service to work at the polls on election day so long as they are on vacation on have taken a personal day from their public sector job.

COPY ... IN THE CUSTODY ... HISTORICAL SOCIETY ... PROVISIONS OF SECTION 149.31 OF THE OHIO REVISED CODE."

ADVISORY NO. 95 -10
August 24, 1995

<u>ALL COUNTY BOARDS OF ELECTIONS</u>
TO: Members, Directors & Deputy Directors

***Am. Sub. H.B. 99, Ohio's Comprehensive Elections Law Modernization Act***

Am. Sub. H.B. 99, Ohio's comprehensive elections law modernization legislation, was signed by Governor Voinovich on August 22, 1995. Since the legislation was enacted as an emergency measure, it became effective on August 22, 1995, and is applicable to all elections held after August 22, 1995. A copy of the law is enclosed.

This legislation is the result of the efforts of all Ohio elections officials and includes recommendations for elections law changes proposed by board members, directors and deputy directors.

Am. Sub. H.B. 99 also includes provisions amending Am. Sub. S.B. 8, Ohio's new Campaign Finance Law, and the adoption of Ohio's new Disclaimer Law based on the decision of the United States Supreme Court in *McIntyre v. The Ohio Elections Commission* (April 19, 1995). Separate advisories will be sent to you concerning these provisions.

In addition to modernizing Title 35 of the Ohio Revised Code by deleting references to "black lead pencils," "marking ballots with an X," and gender specific terms, this legislation makes substantive changes throughout Title 35 and to other sections of the revised code. These changes are summarized as follows:

## I. NVRA IMPLEMENTATION AMENDMENTS

Several Revised Code sections relating to Ohio's implementation of the 1993 National Voter Registration Act (NVRA) are amended as follows:

### A. <u>Voter Registration Through Schools, Libraries and County Treasurers Offices</u>

R.C. 3501.01(X), 3501.05, 3503.10 and 3503.19 have been amended to clarify that county treasurers offices, public high schools and vocational schools, and public libraries will provide voter registration services in accordance with programs prescribed by the secretary

of state in lieu of the requirements specified for designated voter registration agencies (such as the Department of Health and the Department of Human Services). The requirement that completed voter registration forms be transmitted to a board of elections within five (5) days by **all** agencies providing voter registration services has not changed.

B. Voter Registration and "Walk-in" Voting Procedures

R.C. 3503.16 and 3503.19 as amended clarify that voter registration forms returned by mail may be returned only to the office of the secretary of state or a board of elections, not designated or other agencies. Additionally, **any person** may be provided voter registration forms by a board of elections.

R.C. 3503.16 has been amended to clarify that a registered voter who moves within his or her precinct or changes his or her name and remains in the same precinct, but has not updated his or her registration, is not a "walk-in" voter. The voter may update his or her registration and vote on election day in his or her precinct. Divisions (B) and (C) of this section have been amended to clarify that a registered voter who moves from one precinct to another, or from one county to another, who has not updated his or her registration prior to the twenty-eighth (**28th**) day before an election, qualifies as a "walk-in" voter. Prior law had set this deadline at thirty-five (35) days before an election, which was inconsistent with the deadline for the close of voter registration. Division (B) has been further amended to clarify that a "walk-in" voter who moves within the county has the choice of voting at his or her new polling place, the board of elections office, or a site designated by the board. This clarification is consistent with this office's interpretation of the requirements of the NVRA.

C. Absentee Ballots for Ill or Disabled "Walk-in" Voters

R.C. 3503.16 (G) and R.C. 3509.08(B)(2) have been added to allow ill or disabled "walk-in" voters to vote by absentee ballot.

D. Death Notices

R.C. 3503.18 as amended requires the Ohio Director of Health, in addition to local health departments, to notify local boards of elections of county residents who died in Ohio or other states.

E. Acknowledgement Notices

R.C. 3503.16(E) as amended clarifies that, upon receipt of a change of name or address, a board of elections will send an acknowledgement notice -- **not** a confirmation notice -- to the registered voter.

## II. BOARD OF ELECTIONS PERSONNEL, DUTIES, AND PROCEDURES

### A. Election of Director and Deputy Director

R.C. 3501.09 as amended deletes the requirement that a board of elections meet on or before 1:00 p.m. on reorganization day and vote every twenty (20) minutes on the selection of the director and deputy director. Therefore, a board may now choose to meet at any time on reorganization day. The "five ballot" requirement for choosing a director remains in place.

### B. Transmittal of Petitions and Tie-Votes

R.C. 3501.11(K) has been clarified to require that petitions forwarded to a board of elections by the secretary of state for signature verification be returned to the secretary of state. Also, all tie-votes must be forwarded to the secretary of state within fourteen (14) days.

### C. Board Hours prior to Registration Deadlines

The requirement in R.C. 3501.10(B) that each county board of elections remain open for four (4) hours every Saturday and three (3) evening hours every week for three (3) weeks prior to the registration deadline before a primary or general election has been modified to allow the board to choose which additional seven (7) hours each week it will remain open prior to the close of registration.

### D. Board Offices as Polling Location

R.C. 3501.11 as amended clarifies that, on those days when voters may vote in person at the board offices or sites designated by the board, those locations are considered to be polling places.

### E. Suspension of Board Members and Employees for Misconduct

R.C. 3501.16 as amended allows the secretary of state to suspend or remove a board member or other election official for misconduct or good cause. Prior law limited the secretary's authority to removal only.

## III. PRECINCT AMENDMENTS

Several changes were made concerning precincts and precinct officials as follows:

### A. Precinct Size

The maximum number of registered voters in a precinct is increased to one thousand (1,000). R.C. 3501.18

B. Local Option Elections

The law has been clarified to provide that, if a board of elections changes the boundaries of a precinct after local option petitions have been filed calling for an election in that precinct, the election will be held in the area that constituted the precinct prior to the change in boundaries. R.C. 3501.18.

C. Precinct Election Officials

R.C. 3501.22 as amended reduces the minimum number of judges per precinct from six (6) to four (4). No more than 1/2 may be from the same political party. This section was also amended to provide for the appointment of the precinct presiding judge and clarify the duties of precinct election officials. R.C. 124.57 as amended allows "classified" government employees to serve as precinct election officials.

D. Other Precinct Changes

1. Election day materials may now be delivered to polling locations or picked up by presiding judges up to ten (10) days before an election. R.C. 3501.31.

2. The requirement that polling places be open between 7:00 p.m. and 7:30 p.m. on the Monday before an election has been deleted. R.C. 3501.31.

3. Precinct registration lists which must be prepared fifteen (15) days before an election will be available for inspection during normal business hours at the board of elections before election day and must be posted at the polling place on election day. R.C. 3503.23. Prior law required these lists be posted at the polling place fifteen (15) days before the election.

4. The reference to "registration" precinct in R.C. 3503.25 has been deleted.

## IV. RESIDENCY REQUIREMENTS

A. Rules for Determining Residence

R.C. 3503.02(F) has been amended to provide that persons who **continuously** reside outside of Ohio for four (4) or more years are considered to have lost their residency in this state. This provision does **not** apply to persons who reside out of Ohio because of federal government employment, including military personnel.

B. Former Residents

R.C. 3504.01 and .02 as amended allow former Ohio residents who moved to another state not more than ninety (90) days before a Presidential election to vote in Ohio for President and Vice-President. The prior limitation was thirty (30) days. The former resident must not have registered to vote or voted in an election in another state since leaving Ohio and must complete a certificate of intent to that effect and file it with the board of elections not later than thirty (30) days before the Presidential election.

C. Signing or Circulating Petitions

R.C. 3503.06 as amended clarifies that a registered voter who will have resided in the county and precinct for at least thirty (30) days at the time of the next election may circulate or sign any petition. *Note: This requirement is not applicable to a circulator of initiative or referendum petitions unless the circulator is otherwise required by law to be a registered voter and to reside in the area where the petition is circulated.*

D. Challenge Procedures

R.C. 3503.24 as amended provides that applications to correct any voter registration list or to challenge any voter must be filed no later than eleven (11) days before an election instead of ten (10) days, since the tenth (10th) day falls on Saturday.

## V. BALLOTS AND BALLOT COUNTING

Several amendments were made to Revised Code sections concerning ballots and ballot counting, including changes in the canvass procedures. These amendments are summarized as follows:

A. Separate Ballots

R.C. 3505.07 as amended allows the use of separate ballots for local candidates and issues if it is not feasible to place those candidates or issues on the regular ballot. Additionally, separate ballots may be used when a candidate or issue is ordered on the ballot by a court after the regular ballots have been printed.

B. Ballot Stubs

R.C. 3505.08, 3506.08, and 3506.09 were amended to reduce the length of ballot stubs from one and one-half inches to no less than one-half inch. Additionally, if an acceptable ballot accounting method is approved by the secretary of state on written application by a board of elections, ballots may have one (1) stub instead of two (2).

C. Ballot Counting Procedures

The outdated ballot counting procedures contained in R.C. 3505.27 have been deleted. A board of elections may now adopt any ballot counting procedure that assures an accurate count. Also, the requirement to maintain two (2) sets of poll books has been deleted. The clerk of courts poll book is no longer required. R.C. 3505.31.

D. Unofficial Results

R.C. 3505.30 was amended to codify the current practice of allowing the faxing of unofficial election night results to the secretary of state.

E. Canvass Procedures

At the request of several boards of elections, R.C. 3505.32 was amended to allow boards to perform certain administrative tasks prior to the beginning of the official canvass, including examining and comparing poll books, tally sheets, poll lists and precinct vote summaries. Additionally, boards are required to count all ballots during the official canvass. Finally, R.C. 3505.33 was amended to delete Abstract Form 2 since it contains the same results as Abstract Form 3.

F. Computer Pre-tests

Boards of elections are no longer required to send a report of computer ballot counting equipment pre-tests to the secretary of state. R.C. 3506.14. However, this section still requires that these tests be conducted. **Given the fact that several boards have recently experienced counting errors due to improper software programming, I strongly urge that boards pre-test the program for *all* precincts prior to every election.**

G. Recount Notices

R.C. 3515.03 now provides that recount notices be sent certified, rather than registered, mail.

## VI. ABSENTEE BALLOT AMENDMENTS

A. Qualifications for Absentee Voters

R.C. 3509.02 as amended expands the classes of persons who may apply to vote by absentee ballot to include full-time firefighters, peace officers, providers of emergency medical services, and persons hired temporarily by boards of elections as election day workers. Also, a person who will be unable to vote on election day because a member of the person's

family will be in a hospital on election day may vote by absentee ballot. (Prior law allowed only the person who was hospitalized to vote by absentee ballot.)

B. Absentee Ballot Application

R.C. 3509.03 as amended requires that the absentee ballot application be signed by the applicant. **Also, absentee ballot requests now may be made in person on the day before election day.** This provision was added to allow persons who qualify to vote absentee and have an unforeseen emergency to apply and vote on the Monday before an election. The deadline for **mail-in** absentee ballot applications remains 12:00 noon on the third (3rd) day before the election.

C. Faxing of Absentee Ballot Applications and Ballots

R.C. 3509.031 and 3511.02 were amended to allow Reserve and National Guard members serving on active duty and overseas military personnel to request and receive absentee ballots by fax. Completed ballots may **not** be returned by fax.

D. Persons Confined in Hospitals

R.C. 3509.08(B)(1) as amended eliminates the requirement that persons confined in a hospital due to accident or unforeseen emergency be confined no more than six (6) days prior to an election to apply for absentee ballots. Now any person confined in a hospital on election day may apply to vote absentee without regard to the length of the hospital stay.

E. "Walk-in" Absentee Voters

R.C. 3509.08 as amended provides that "walk-in" voters who are confined in hospitals due to accident or other emergency, or who are disabled, qualify as absentee voters and will vote the provisional ballot.

## VII. CANDIDACY AMENDMENTS

Many changes have been made in statutory provisions relating to candidates and candidacies. These changes are summarized as follows:

A. Disqualification of Candidate by Board of Elections

R.C. 3501.39 as amended prohibits a board of elections from disqualifying any candidate after the fiftieth (**50th**) day before a primary election (in the case of primary candidates) and general election (in the case of independent and non-partisan candidates).

B. "Sore Loser" Prohibition

Based on court interpretation, R.C. 3513.04 has been amended to specifically preclude a person who seeks primary nomination for President from being a candidate for any office in the general election by nominating petition or as a write-in.

C. Write-In Candidacy

R.C. 3513.041, .14, and .23 have been amended concerning write-in candidacies as follows:

1. A write-in space on the ballot for a particular office shall not be provided unless a valid declaration of intent to be a write-in candidate for the office has been filed. Also, the deadline for filing a declaration of intent to be a write-in candidate is now 4:00 p.m. of the fiftieth (**50th**) day, instead of the fortieth (40th) day, before an election. R.C. 3513.041 and 3513.14.

2. A protest procedure against write-in candidacies has been adopted. The deadline for filing a protest against a write-in candidacy is 4:00 p.m. of the forty-fifth (**45th**) day before the election. R.C. 3513.041.

3. Votes for a write-in candidate who has not filed a valid declaration of intent will not be counted. R.C. 3513.041 and 3513.23.

D. Declaration of Candidacy

The form of the declaration of candidacy specified in R.C. 3513.07 has been changed to substitute "voting residence" for "post office address." Many boards of elections considered "post office address" to be misleading. My office currently is revising and simplifying candidate petitions. New petition forms will be provided to all boards of elections this fall. Current petition forms are valid and may be distributed to all prospective candidates.

E. Party Affiliation of Primary Candidates

On the initiative of the General Assembly, major revisions have been made concerning restrictions on primary candidates based on party affiliation. Prior law prohibited a person from being a candidate in a party primary if that person voted in a different political party primary within the current year or the immediately preceding two calendar years. R.C. 3513.19 and .191 have been amended as follows:

1. Non-office Holder: A person who does not currently hold elective office may be a candidate in a party primary regardless of how the person voted in any prior primary election. For example, a person who voted in the Republican primary in 1993 may be a candidate in a Democratic primary in 1995.

2. Elected Office Holder: An elected office holder may be a candidate in a party primary even if he or she previously voted in another party's primary in the current year or two (2) preceding calendar years **if** the officeholder files a declaration of intent to seek nomination in that party's primary with the appropriate board of elections not later than 4:00 p.m. on the thirtieth (30th) day before the deadline for filing his or her declaration of candidacy. **Only one declaration of intent may be filed in any ten-year period.** For example, a county auditor who voted in the Democratic primary in 1994 could seek nomination in the Republican primary in 1996 by filing a declaration of intent to seek nomination in the Republican primary no later than thirty (30) days before the primary filing deadline.

3. Forfeiture of Candidacy: R.C. 3513.192 has been added to provide that any person nominated in a primary election forfeits the nomination if that person votes **in the same primary election** as a member of a **different** political party.

F. Board of Education and Municipal Candidate Signature Requirements

1. The petition signature requirement for candidates for non-partisan office in villages of less than two thousand (2,000) population has been reduced from twenty-five (25) to ten (**10**). In municipal corporations with a population of two thousand (2,000) or more, the signature requirement is fifty (**50**). R.C. 3513.251.

2. County boards of education have been redesignated "**educational service center governing boards**" under Am. Sub. H.B. 117. The petition signature requirement for candidates for educational service center governing boards other than those described in R.C. 3311.051 has been reduced from one hundred fifty (150) to fifty (**50**). R.C. 3513.255.

3. The petition signature requirement for candidates for state board of education has been reduced to a minimum of one hundred (**100**). R.C. 3513.259.

G. Withdrawal of Candidacy, Death of Candidate

1. Withdrawal of Candidacy: Based on the Ohio Supreme Court's decision in *White v. Franklin County Board of Elections* (1992), 65 Ohio St.3d 45, R.C. 3513.30 has been amended to provide that a primary or general election candidate may withdraw his or her candidacy at any time prior to the election by filing a statement of withdrawal with the appropriate board of elections. Division (E) requires that a withdrawn candidate's name be removed from the ballot to the extent practicable. If the name cannot be removed from all the

ballots prior to election day, or if absentee ballots have already been mailed, votes cast for a withdrawn candidate shall not be counted. There is no provision for replacing withdrawn primary candidates on the primary ballot.

2. Death of Primary Candidate: R.C. 3513.30 as amended provides that if the only candidate in a party primary for a particular office dies prior to the tenth (10th) day before the primary, not only may that party replace its candidate on the primary ballot, but any other political party may select a primary candidate for that office. The other political party may select a primary candidate even if it does not have a candidate at that time, or if its only candidate has died or withdrawn from the primary election. For example, the Republican primary candidate for treasurer in a particular county dies on the forty-fifth (45th) day before the primary; there is no Democratic primary candidate. Under the new procedure, not only may the Republican party select another candidate, but the Democratic party may at this point select a primary candidate for treasurer.

   If the only party primary candidate for a particular office dies on or after the tenth (10th) day before the primary, that candidate is considered to have received the nomination and may be replaced after the primary.

3. Replacement of Congressional Primary Candidate: R.C. 3513.301 as amended provides that if the only candidate for Congress in a party's primary **dies or withdraws** at any time before the primary election, a special Congressional primary will be held. In that special primary election, not only may the political party whose candidate died or withdrew nominate a new candidate, but any other political party which did not have a primary candidate or whose only candidate died or withdrew, may also nominate a Congressional candidate.

H. Replacement of Candidates after the Primary Election

1. Candidates who Withdraw: Prior law allowed a candidate nominated in a primary election to withdraw up to eighty (80) days before the general election. Based on the *White* case (see VII.G.1. above), there is no longer a deadline for candidates to withdraw. **However, political parties and committees of independent candidates may replace withdrawn candidates only up to the seventy-sixth (76th) day before the general election.** Not only may the party whose candidate withdraws replace that candidate, but any other political party may select a candidate, even if that other political party did not previously name a candidate, or if its candidate has died or withdrawn. Also, a majority of the committee named by an independent candidate may name a replacement candidate if the original independent candidate has died or withdrawn.

The provision allowing independent candidates who withdraw prior to a general election to be replaced up to the seventy-sixth (76th) day before the election by their named committee is a new one. Also, the provision that the withdrawal of a party or independent candidate triggers the right of any other political party or independent candidate committee to select a candidate under certain circumstances is not contained in prior law.

2. <u>Death of Candidates</u>: R.C. 3513.31(G), (H) and (K) contain the provisions applicable to replacing party and independent candidates who die prior to the general election. These provisions are the same as in prior law **except** that Division (K) has been added to allow any other political party to select a candidate for the general election if that other political party has not selected a candidate, or if its candidate has died or withdrawn. Also, a majority of the committee named by an independent candidate may select a replacement candidate if the original independent candidate has died or withdrawn.

## VIII. QUESTIONS AND ISSUES

### A. <u>Filing Deadlines</u>

R.C. 3501.02 has been amended to require that all questions and issues shall be certified to a board of elections **no later than 4:00 p.m.** of the seventy-fifth (75th) day before the election.

### B. <u>Approval of Ballot Language</u>

R.C. 3501.05(J) and R.C. 3501.11(W) have been amended to clarify the duties of boards of elections and the secretary of state in approving ballot language for local questions and issues. Boards of elections have the primary duty to approve ballot language and forward the approved language to the secretary of state for final approval.

### C. <u>Form of Statewide Petitions</u>

R.C. 3519.05 has been amended to delete the requirement that certain language on statewide issue petitions be printed in red.

### D. <u>Election Date for Park District Levies</u>

R.C. 511.27 and 1545.21 have been amended to clarify that park district levies proposed by township and other park districts may be submitted to the voters at the next general election or on the primary date in any year, whether or not a primary election is held.

## IX. SPECIAL PRIMARY CONGRESSIONAL ELECTIONS

R.C. 3501.05(U) has been adopted to allow the secretary of state to set elections deadlines for the filing of petitions, protests, write-in candidacies, absentee ballot availability, voter challenges, and other acts in special congressional primary elections ordered pursuant to R.C. 3513.32.

## X. FORMS

Many of the provisions of Am. Sub.H.B. 99 require revision of existing forms or adoption of new forms. My staff has revised and I have prescribed these forms, which are included at Appendix I. Each form contains the Revised Code citation applicable to that form.

## CONCLUSION

To assist you in implementing this complex legislation my office will compile and publish a fact sheet in question and answer form based on questions and issues you submit to my Elections Division staff. After you review and work with the provisions of Am. Sub. H.B. 99, please forward questions to my office, Attention: Pat Wolfe, or call any member of my Elections Division Staff at (614) 466-2585.

In conclusion, I wish to thank all elections officials who participated in the passage of this important legislation.

Sincerely,

Bob Taft

Bob Taft
Secretary of State

f:\users\elect.wp\88CA
8/22/95